Daniel L. Steele (6336)
Grant M. Sumsion (6445)
SUMSION STEELE & CRANDALL
545 E, University Parkway, Suite 200
Orem, UT 84097
Telephone: (801) 426-6888
Email: dan@sumsionsteele.com
         grant@sumsionsteele.com

Bron Rammell (ID State Bar No. 4389)
MAY, RAMMELL & WELLS, CHARTERED
216 W. Whitman
P.O. Box 370
Pocatello, Idaho 83204-0370
Email: bron@mrwlaw.net

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| NEHEMIAH MCFARLIN and ATOATASI FOX,<br><br>Plaintiffs,<br><br>vs.<br><br>BOX ELDER COUNTY; BOX ELDER COUNTY SHERIFF'S OFFICE; ADAM WALKER, individually; JUSTIN ZILLES, individually; STEVEN BERRY, individually; Z. MOORE, individually; SHANE NEBEKER, individually; L. MAUGHAN, individually; ONEIDA COUNTY; ONEIDA COUNTY SHERIFF'S OFFICE; SHERIFF JEFF SEMRAD, individually; DETECTIVE PATSY SHERMAN, individually; and JOHN and JANE DOES I-X, individually,<br><br>Defendants. | Case No.1:18-cv-00156-DAK-CMR<br><br><br>**REPLY TO ONEIDA COUNTY DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT(SECOND AMENDED) (DKT. 72.)**<br><br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiff Nehemiah Mcfarlin hereby Replies to Oneida County, Oneida County Sheriff's Office, Sheriff Jeff Semrad and Detective Patsy Sherman's (collectively the "Oneida County Defendants") Opposition to Plaintiffs' Motion for Leave to Amend (Second Amended) (DKT. 72) as follows:

## REPLY

### I.    LEGAL ARGUMENT

Pursuant to F.R.C.P. 15, a plaintiff may amend his complaint 21 days after a responsive pleading, but only with the opposing party's consent, or leave from the court.[1] "The court should freely give leave when justice so requires."[2] If the court determines that the amended complaint would be futile, it may deny leave to amend.[3] It seems likely the denial of the right to amend is discretionary (as opposed to mandatory) in order to discourage premature determinations of futility.

### A.   Plaintiff does not seek to add a cause of spoliation to his complaint, but rather seeks to add facts that show spoliation for future evidentiary remedies.

The Oneida County Defendant's only argument as to why the addition of facts pertaining to the Oneida County Defendant's negligent spoliation of evidence would be futile, is the argument that Idaho has not recognized spoliation as an independent cause of action.[4] Frankly, Plaintiff agrees. It is for this reason that Plaintiff does not seek to add a new cause of action related to spoliation, but rather allege said facts regarding spoliation,

---

[1] F.R.C.P. 15(a)(2).
[2] F.R.C.P. 15(a)(2).
[3] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 11126 (10th Cir. 1997) emphasis added.
[4] *See* Memorandum In Opposition to Plaintiff's Motion for Leave to Amend Complaint (Second Amended) (DKT. 72) at page 3–5.

so that he may later seek other remedies and relief that the law provides. Furthermore, the facts that Plaintiff seeks to add, further show that no reasonable officer could have found that probable cause justified Plaintiff's arrest.

A court may place sanctions upon a defendant who causes the spoliation of evidence.[5] Spoliation occurs where: "(1) a party has a duty to preserve evidence because it knew, or should have known that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence."[6] When spoliation occurs, the district court has the discretion to enter a range of sanctions/remedies.[7] Said sanctions/remedies can include: dismissing the action;[8] entering a default judgment;[9] ordering that adverse inference be found;[10] or any other appropriate remedy the court may fashion in its discretion.[11]

Here, Plaintiff has sought to amend his complaint to show that he is entitled to some relief for the Oneida County Defendant's acts and omissions which caused the spoliation of evidence. While Plaintiff will later provide the Court with a more in depth argument as to why he is entitled to some evidentiary relief when he moves the Court for said relief; the factual allegations that Plaintiff seeks to add into his complaint show that said relief is warranted.

---

[5] *Turner v. Public Serv. Co.*, 563 F.3d 1136, 1149 (10th Cir. 2009).
[6] *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1220 (10th Cir. 2008).
[7] *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 862 (10th Cir. 2005).
[8] F.R.C.P. 37(e) (Applying specifically to the failure to preserve electronically stored information).
[9] *Id.*
[10] *Turner*, 563 F.3d at 1149.
[11] *Henning*, 530 F.3d at 1220.

To begin with, these factual allegations show that the Oneida County Defendants knew, or should have known that litigation was imminent.[12] As early as the morning after Plaintiffs' arrest, (but likely much sooner), the Oneida County Defendants knew that they had arrested the wrong individuals.[13] Within a day after arresting Mr. McFarlin, Sheriff Semrad sent an email to Doug Williams and Patsy Sherman admitting that McFarlin's Camarro did not match the description of the suspect's vehicle, and that other evidence supplied by his employees was not reliable, or had been improperly obtained.[14] Finally, even if their realization that they had arrested two innocent young men based upon improper police work was not enough to put the Oneida County Defendants on notice that litigation was imminent; the fact that Mr. McFarlin filed a Tort Claim Notice with the state of Idaho a few months later gave Defendants unquestionable notice that litigation would likely ensue.[15]

Furthermore, the destruction of the evidence was highly prejudicial to Plaintiff's claims. Particularly the claim that Defendant's fabricated false or misleading evidence to justify Plaintiff's continued detention in another jurisdiction.[16]

Shortly after Plaintiff's arrest, Sheriff Semrad instructed Doug Williams to take a picture of Plaintiff so that it could be shown to witnesses.[17] Based on evidence obtained through discovery, it is likely that the photos themselves were highly suggestive to the

---

[12] *See* Second Amended Complaint pgh 147–60.
[13] *See Id.* at pgh 117–18.
[14] *See Id.* at pgh 145, 288, 308.
[15] *See Id.* at pgh 151.
[16] *See Id.* at pgh 200.
[17] *See Id.* at pgh 147–48.

point that they should have never been used for a witness identification.[18] Doug Williams has admitted that he took the photograph of Mr. McFarlin while he was handcuffed, and being held in the back of a police vehicle.[19] However, the full force of how suggestive these photographs actually were cannot be garnered from testimony alone,[20] but would have to be seen by the finder of fact. Since the Oneida County Defendants have destroyed this evidence, there is no way for a jury to determine the suggestiveness of the photos themselves, and therefore, no way to fully consider this evidence in their determination of whether the identification of Mr. McFarlin as the robber actually did create probable cause.

Similarly, the Oneida County Defendants also claim that measurements of the tire tracks of the suspect's vehicle matched the measurements of Mr. McFarlin's Camaro.[21] This assertion was allegedly one of the factors contributing to the probable cause which they claim justified Mr. McFarlin's arrest and continued detention.[22]

However, based upon evidence obtained through discovery, Plaintiff believes that Defendants never actually took these measurements, or that the methods used in obtaining and comparing the measurements were blatantly flawed to the point that they

---

[18] *See* Transcript of Doug Williams' Deposition pg 118-119.

[19] *See* Transcript of Doug Williams' Deposition pg 75-77.

[20] For example: It is unknown whether the details of the photo would have shown Mr. McFarlin's hands in cuffs, the interior of the police vehicle, the presence of law enforcement personnel, or failed to show Mr. McFarlin's clothing which did not match the suspect's. All of these factors would be significant in determining the reliability of the identification.

[21] *See* Second Amended Complaint pgh 154–55.

[22] *See* Second Amended Complaint pgh 154–55.

could not be used to support probable cause. After all, they did allegedly contribute to a false arrest.

It is plaintiff's position, that if these photographs existed, they would have shown that the tire tracks the Oneida County Defendants claimed to have measured at the bank were not the only tracks in the area and therefore, could not have been attributed to the suspect's vehicle with any reasonable certainty. Furthermore, they would have also shown the methods used to measure, and the actual measurements themselves. Accordingly, it is likely that said pictures, if they ever existed, would show that said measurements were obtained in an unreliable manor; or the results were misstated by the Oneida County Defendants in an attempt to bolster probable cause.

For example, arrest reports make reference to Defendants measuring the wheelbase of both vehicles, but in their depositions, Defendants describe taking measurements of a different dimension of the vehicle that is not the wheelbase. Without these photos, Mr. McFarlin has been prejudiced in his ability to prove that the measurements did not create probable cause, and may have even diminished it.

Accordingly, amending the complaint to contain these allegations is not futile, but will allow Mr. McFarlin to seek the evidentiary relief he is entitled to. Furthermore, it will help bolster his claim that he was arrested without probable cause.

### B. McFarlin's Fourth Amendment Claim Regarding the Probable Cause Affidavit Is Proper.

The Oneida County Defendants argue that Mr. McFarlin's motion to amend his complaint, as it pertains to additional allegations of the false and misleading affidavit of probable cause would be futile.[23] To support this argument, the Oneida County Defendants assert that: (1) the misleading statements are immaterial; and, that Mr. McFarlin had already consented to the search of his vehicle.[24]

An affiant violates the Fourth Amendment when he "knowingly and intentionally, or with reckless disregard for the truth" provides false statements in an affidavit for probable cause in support of a warrant application.[25] An omission of a material fact is also a constitutional violation if the inclusion of those facts would diminish probable cause.[26] In fact, "[r]ecklessness may be inferred from omission of facts which are clearly critical to a finding of probable cause."[27]

The Tenth Circuit has illustrated the kind of omission that vitiates probable cause.[28] In *Stewart v. Donges*, the plaintiff, Stewart, was arrested with a warrant that was obtained as a result of Defendant Donges affidavit.[29] Donges' affidavit was based on three main assertions: (1) that a witness had told him that Stewart had stolen property from their home; (2) that some of the allegedly stolen property had been found in Stewart's home, though he claimed he had permission to take said property; and (3) that

---

[23] *See* Memorandum in Opposition to Plaintiff's Motion for Leave to Amend Complaint pg 5.
[24] *See Id.*
[25] *Franks v. Delaware*, 438 U.S. 154, 155 (1978).
[26] *United States v. Basham*, 268 F.3d 1199, 1204 (10th Cir. 2001).
[27] *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th cir. 1990) internal citations omitted.
[28] *See Stewart v. Donges*, 915 F.2d 572 (10th Cir. 1990); *see also Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004).
[29] *Stewart*, 915 F.2d at 580–81.

Stewart had failed a polygraph test when questioned about his involvement in the alleged theft.[30] However, before arresting Stewart, Donges learned that another officer had heard the witness bragging that she had made up the allegations of the theft to get Donges in trouble; the officer advised Donges to investigate the validity of the witness's statement further.[31] Donges did not correct his affidavit to contain the fact that the witnesses testimony may not be reliable.[32] The court held that such an omission would have been material and would have violated Stewart's constitutional rights.[33]

In this case, Mr. McFarlin seeks to add allegations that Sherman and Bowcutt's affidavit made several key omissions and misrepresentations.[34] To begin with, the Oneida County Defendants do not deny that the subject affidavit falsely claims that Mr. McFarlin's vehicle had a temporary license sticker, when it in fact had a temporary license plate.[35] Nor do they deny that the affidavit stated that Mr. McFarlin's vehicle had no hubcaps[36]; a misleading statement.[37]

---

[30] *See Id.*
[31] *See Id.* at 581.
[32] *Id.*
[33] *Id.* at 581, 83.
[34] *See* Second Amended Complaint pgh. 125–34.
[35] *See* Memorandum in Opposition to Plaintiff's Motion for Leave to Amend Complaint (Second Amended) (DKT. 72.) pg. 7.
[36] *See Id.*
[37] As explained in the Second Amended Complaint pgh. 128, this is misleading. Mr. McFarlin's vehicle clearly was not supposed to have hubcaps where the suspect's vehicle was described as one that should have hubcaps, but was missing some or all of them. This is akin to describing a convertible as a vehicle without a roof; while technically true, it implies that it is missing a roof rather than being designed not to have one.

CASE NO: 1:18-cv-00156-DAK-CMR – PLAINTIFF'S REPLY TO ONEIDA COUNTY DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION  FOR LEAVE TO AMEND COMPLAINT (SECOND AMENDED) (DKT. 72.)

They also do not deny that the affidavit omitted several key facts, as alleged in the complaint;[38] those omissions being: (1) that the photo identification was not shown as a line up and was done in a highly suggestive manner; (2) that the witness who made the false identification described the suspect as wearing a hood and sunglasses that would have obstructed her view of his facial features; (3) that McFarlin had consented to the search of his vehicle, his phone, and anything else needed to prove his innocence; (4) that the vehicle had already been searched and no evidence was found; and, (5) that prior to creating the affidavit, Defendants had already found evidence that verified Plaintiff's alibi.[39]  Rather, Defendants merely argue that these misstatements and omissions were immaterial. [40]

However, when looking at the affidavit after correcting the misstatements and misleading assertions,  and adding the omitted facts; it is clear that probable cause did not exist to justify Mr. McFarlin's arrest. The affidavit states that the suspect's vehicle was described as having the following six features: (1) white;  (2) four door; (3) without a rear licence plate, but with a temporary license sticker in the window; (4) Toyota; (5) having black wheels with no hubcaps; and (6) extensive front end damage.[41] The affidavit described Mr. McFarlin's vehicle as having the following features: (1) white; (2) Chevy; (3) front end damage; (4) a temporary license sticker in the window; and (5) black wheel

---

[38] *See* Memorandum in Opposition to Plaintiff's Motion for Leave to Amend Complaint (Second Amended) (DKT. 72.) pg. 7.

[39] *See* Second Amended Complaint pgh. 125–34.

[40] *See* Memorandum in Opposition to Plaintiff's Motion for Leave to Amend Complaint (Second Amended) (DKT. 72.) pg. 7.

[41] *See* Exhibit A of Affidavit of Blake G. Hall in Support of Opposition to Plaintiff's Motion for Leave to Amend Complaint (Second Amended) (DKT. 72). pg. 3.

rims and no hubcaps.[42] Accordingly, though the affidavit does concede that Mr. McFarlin's vehicle was a Chevy instead of a Toyota, it claims that it matches four of the other six characteristics of the suspect's car.

If omitted, incorrect, or misleading information is added or corrected, the affidavit would have stated that Mr. McFarlin's vehicle was: (1) White; (2) Chevy; (3) had black spoke wheels, *but was not missing hubcaps*; (4) two door, *not four door*; (5) A dealer plate and no temporary license sticker in the window, *instead of missing plates*; (6) and though his vehicle had front end damage, the Oneida Defendants found evidence to support Plaintiff's alibi that the damage was sustained on the freeway between Malad and Box Elder County. Therefore, had the Oneida County Defendants not acted with blatant disregard for the truth, the affidavit would have shown that Mr. McFarlin's vehicle matched only one of the six features of the suspect's vehicle as illustrated in exhibit A.

Furthermore, the Oneida County defendants failed to mention in the affidavit that they had already searched Mr. McFarlin's vehicle and had found no evidence of the crime. Had these omissions and misstatements been added and corrected, Defendants would have been asserting probable cause to search a vehicle that was the same color as the vehicle used in a robbery. However, they would have had to acknowledge that it was different from the suspect's vehicle in several other key features, and that it had already been searched and no evidence had been found. Clearly, this would not be enough to establish probable cause. In fact, Doug Williams admitted that he suspected that the circumstances had led him to believe that Plaintiff was not the bank robber the night he

---

[42] *Id.* at pg. 4.

CASE NO: 1:18-cv-00156-DAK-CMR – PLAINTIFF'S REPLY TO ONEIDA COUNTY
DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION  FOR LEAVE TO
AMEND COMPLAINT (SECOND AMENDED) (DKT. 72.)
10 of 17

was arrested.[43] Therefore, all of these omissions and false statements are material and constitute a violation of the Defendant's constitutional rights.

The Oneida County Defendants also argue that because Mr. McFarlin consented to a search, he has waived any claim of a constitutional violation regarding the affidavit of probable cause. However, Defendant's seem to miss the point of Plaintiff's claim. The fact that Mr. McFarlin consented to the search of his vehicle at the time he was arrested, does not grant Defendants the right to falsify an affidavit of probable cause to later obtain an unnecessary and improper search warrant. Especially when doing so prolonged Mr. McFarlin's time in jail for several hours.

An affiant violates the Fourth Amendment when he "knowingly and intentionally, or with reckless disregard for the truth" provides false statements in an affidavit for probable cause in support of a warrant application.[44] Plaintiff's Counsel could find no authority to support the argument that when a criminal suspect offers his consent for officers to search his vehicle at the time of his arrest, he has thus consented to allow law enforcement to later commit perjury in an affidavit of probable cause. Furthermore, it is well known that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" [45]

In this case, it was unreasonable for Defendants to arrest Plaintiff for the robbery in Malad. It was even more unreasonable for Defendants to delay his release, by

---

[43] *See* Deposition of Doug Williams pg. 118.

[44] *Franks v. Delaware*, 438 U.S. 154, 155 (1978).

[45] *United States v. McHugh*, 639 F.3d 1250, 1260 (10th Cir. 2011) quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

CASE NO: 1:18-cv-00156-DAK-CMR – PLAINTIFF'S REPLY TO ONEIDA COUNTY DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION  FOR LEAVE TO AMEND COMPLAINT (SECOND AMENDED) (DKT. 72.)

providing a false and misleading affidavit so that they could search his vehicle. Not only did Defendants have permission to search his vehicle at the time of the arrest, but they had already searched  the vehicle and found nothing. Prior to applying for the search warrant, Defendants had all the same evidence they had at the time they released Plaintiff. How then is it reasonable to delay that release so that they could provide false information to a court;  to obtain an unnecessary warrant; to search a vehicle they already knew did not contain any evidence? The fact that Mr. McFarlin consented to the search of his vehicle, does not provide Defendants with the go ahead to violate his Fourth Amendment rights with such unreasonable behavior.

Finally, the Oneida County Defendants claim that Lieutenant Sherman did not violate any clearly established right, and therefore she is entitled to qualified immunity.[46] This is the same argument that the defendant in *Stewart v. Donges* made almost thirty years ago.[47] In that case, the Tenth Circuit held that making a material omission in the affidavit for probable cause is a violation of a criminal suspect's "clearly established rights."[48] Because, Lieutenant Sherman, and the other Oneida County Defendants, violated a clearly established right by intentionally or recklessly disregarding the truth in the affidavit of probable cause, they are not entitled to qualified immunity. [49]

---

[46] *See* Memorandum in Opposition to Plaintiff's Motion for Leave to Amend Complaint pg 10.
[47] *See Stewart*, 915 F.2d at 581.
[48] *Id.* at 581–83.
[49] *Id.* at 581.

DATED this 26th day of July, 2019.

MAY, RAMMELL & WELLS, CHTD.
*Attorneys for Plaintiffs*


 */s/  Bron Rammell*
BRON RAMMELL

<u>CERTIFICATE OF SERVICE</u>

      I certify that on this date a copy of the foregoing *Plaintiff's Reply to Oneida County's Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend Complaint* was served on the following named person(s) at the address(s) shown and in the manner indicated:

| | |
|---|---|
| BLAKE G. HALL, ESQ. | ☐ U.S. Mail |
| SAM L. ANGELL, ESQ. | ☐ Facsimile: |
| HALL ANGELL & ASSOCIATES, LLP | ☐ Hand Delivered |
| 1075 S Utah Avenue, Suite 150 | ☒ Email |
| Idaho Falls, Idaho 83402 | ☒ CM/ECF |
| bgh@hasattorneys.com | |
| sla@hasattorneys.com | |
| | |
| Stephen F. Noel, Esq. | ☐ U.S. Mail |
| SMITH KNOWLES PC | ☐ Facsimile: |
| 2225 Washington Blvd, Ste 200 | ☐ Hand Delivered |
| Ogden, UT 84401 | ☒ Email |
| Email: snoel@smithknowles.com | ☒ CM/ECF |

DATED this 26th day of December, 2019.

      By: */s/  Bron Rammell*
         May, Rammell & Wells, Chartered

## CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT

I certify that Plaintiff's Reply to Oneida County Defendants' Objection to Motion for Leave to Amend Complaint complies with the word-count limit of 2,500 words as established by local rule DUCivR 7-1(a)(3). The final word count of Plaintiffs' Response is 2,475.

DATED this 26th day of December, 2019.


By: _/s/  Andrew Hart_
    May, Rammell & Wells, Chartered

# Exhibit A

| Described features of the suspect's vehicle | How Mr. McFarlin's vehicle was described | How Mr. McFarlin's vehicle actually is |
|---|---|---|
| White | White | White |
| Black wheels with no hubcaps | Black wheel rims with no hubcaps | Black spoke wheels, not designed to have hubcaps. |
| No license plate, but with a temporary license sticker | A temporary license sticker (*did not mention the license plate*) | Temporary license plate, no temporary license sticker |
| Extensive front end damage (at the time of the robber) | Extensive front end damage (at the time of the robbery) | Front end damage obtained between Malad and Box Elder County after the robbery occurred. |
| Toyota | Chevy | Chevy |
| Four door | *not mentioned* | Two Door |
| Could see suspect was alone in the vehicle as he fled the scene | *Did not mention* the Heavily tinted windows that would not allow someone to see in. | Tinted windows to the point that Steve Berry could not see who was in the Camaro. |

| Features matching the suspect's vehicle | 4 of 7 | 1 of 7 |
|---|---|---|

EXHIBIT B

STATE OF IDAHO      )
                    :ss
County of Bannock   )

   Andrew Hart, after being duly sworn, does depose and state:

1. I am counsel for Plaintiff Nehemiah McFarlin, in this action.

2. Attached to this affidavit is a true and correct copy of pages from the transcript of
   Doug Williams' deposition.

FURTHER YOUR AFFIANT SAYETH NAUGHT.


DATED this 26th day of December, 2019.

_____

ANDREW N. HART



SUBSCRIBED AND SWORN to before me this 26th day of December, 2019

[SEAL]

_____
NOTARY PUBLIC FOR IDAHO
Residing at: Pocatello
My Commission Expires: 4-10-2023

McFarlin v.
Box Elder County

Doug Williams
November 22, 2019

Page 74

1    Q.   Okay.  What is that?
2    A.   It's our -- one of our old policy manuals.
3    Q.   Okay.  This is the only policy manual that
4  was provided to me in response to discovery.  And so
5  with that, my understanding would be that this would
6  have been the policy that would have been in place on
7  December 14, 2016, regarding photographs.
8        Is that a fair statement?
9    A.   I can see why you think that, but that is
10  not the policy we was going by at that time.
11   Q.   Really.  So there is some other policy?
12   A.   It is.  I've got it right here.
13   Q.   Sure, I'd love to see it.
14     MR. ANGELL: Let's take a moment off the record
15  if that's okay.
16     MR. RAMMELL: Yeah, let's do it.  Let's take a
17  break anyway.
18       (Recess taken from 10:51 a.m. to 11:07 a.m.)
19   Q.   (BY MR. RAMMELL)  I wanted to go back and
20  realized I hadn't followed up and finished some of my
21  questions about the measurements on the tires that you
22  did with Sheriff Semrad.
23       Okay?
24   A.   Okay.
25   Q.   And what were you measuring when you held

Page 75

1  the tape measure to take the measurements that we were
2  talking about?
3    A.   Wheel base from the distance between the
4  rear wheels or front wheels, whatever.
5    Q.   Okay.  And when you say that, did you take
6  the measurements from the inside of the tire to the
7  inside of the tire, from the inside to the outside,
8  from the outer side of the car to the outer side of
9  the car?  What were you measuring?
10   A.   I can't remember inside or outside wheel.  I
11  remember Jeff told me to put it there, hold it.  He
12  measured it, and said it was a 6-foot wheel base.
13   Q.   Okay.  When you say "put it there," put it
14  the where?  In the center of the tire?
15   A.   I cannot remember whether it was the center,
16  outside, or inside.
17   Q.   But your recollection is you were measuring
18  from the tire not from the outer part of the car, or
19  do you not even remember that?
20   A.   Tire tread to tire tread, from left to
21  right.
22   Q.   Okay.  So I'll just kind of keep going.
23  We'll get back to the policy about the photographs.
24       When you took them, were both of the kids in
25  the back of the car?

Page 76

1    A.   It was.
2    Q.   And were they together or separate?
3    A.   Separate.
4    Q.   Did you edit the picture at any time before
5  you sent it to Lieutenant Sherman?
6    A.   I did not.
7    Q.   And -- I mean, they were in the back seat of
8  the car.  Was there some kind of device or anything in
9  between the front seat and the back seat that you
10  leaned over to take the picture, or how did you take
11  the picture?
12   A.   They was in the rear compartment.  Pretty
13  much open that door, kind of had them turn and face
14  towards me or they looked at me, and I took the
15  picture.
16   Q.   So you took the picture from the outside of
17  the vehicle -- that direction?
18   A.   I was outside.  The door was open.  I was
19  standing outside.  They was inside.  I advised them,
20  "I need to take their picture."  They looked at me,
21  and I snapped the photograph.
22   Q.   Okay.  How close to them were you?
23   A.   A couple feet.
24   Q.   Okay.  Did you ask them to smile?  Just take
25  the picture without their knowledge?  I mean, how did

Page 77

1  you do that?
2    A.   I just told them I need to take their
3  picture, took the picture.
4    Q.   They cooperated with that?
5    A.   Yeah.
6    Q.   In fact, getting back to that, was there any
7  time that you were in contact with either Nehemiah or
8  Atoata that you ever saw them commit any violations of
9  the law?
10   A.   No.
11   Q.   And would it be fair to say that they were
12  always cooperative and always polite with you?
13   A.   They was, extremely.
14   Q.   And they -- they offered multiple
15  explanations and alibis of why they couldn't be the
16  individuals involved in this robbery?
17   A.   They did.
18   Q.   Did -- were you aware that they had
19  authorized a search of their cell phones while at
20  Portage?
21   A.   At Portage, no.
22   Q.   Okay.  You became aware of that at a later
23  time?
24   A.   Just during the interview process, they was
25  willing to let authorities go through their phones.

Page 118

1    Q.  Okay.  And you asked him about videos or
2  places in Pocatello that could show he didn't have
3  front-end damage; correct?
4    A.  Correct.
5    Q.  Did you follow up on any of those?
6    A.  I did not.
7    Q.  Okay.  Why not?
8    A.  I didn't feel there was a need based off the
9  story kind of matching up of the previous -- or the --
10  what I just told you about, me going back to Utah and
11  seeing that their story did kind of match with the
12  damage on the guardrail and stuff.
13    Q.  So by this time were you of the belief that
14  they were probably not the robbers?
15    A.  I was leaning towards that, yes.
16    Q.  Do you know about what time you did come to
17  the conclusion where you believed they probably were
18  not the robbers?
19    A.  Probably shortly after Nehemiah's interview.
20  Probably on the way home, just thinking about it.
21    Q.  Okay.  Nehemiah also then offers to show
22  text messages -- no.  I take that back.  Strike that.
23        You told him that you could show him text
24  messages confirming the identification of him as a
25  suspect.

Page 119

1    A.  Yes.
2    Q.  Was that true?
3    A.  That goes back to the -- when I sent Patsy
4  the pictures, and there could have been a text
5  associated with that.
6    Q.  And that's what I'm getting at is I want to
7  know what was communicated between Lieutenant Sherman
8  and yourself about what the bank tellers had said,
9  whether that was by phone, by text, or what form that
10  took.
11        Can you answer that?
12    A.  I understand, but I can't answer.  I wish
13  there was documentation, but we couldn't find any.
14    Q.  Okay.  Nehemiah also indicated OnStar could
15  track his location; correct?
16    A.  I don't know if Nehemiah said that.  I think
17  I might have referred to OnStar.
18    Q.  Okay.  That was something either you or he
19  thought of, as well, that OnStar would certainly be
20  able to track where they were?
21    A.  Yeah, it was mentioned in the interview.
22    Q.  Do you know if any attempt was made to
23  follow up with OnStar either before or after?
24    A.  I do not.
25    Q.  You told them that if they didn't confess --

Page 120

1  talked how you were off the next day.  If the Feds got
2  involved it would be way worse?
3    A.  I don't think I said if they don't confess.
4    Q.  Okay.  Not necessarily those precise words,
5  but basically the gist what you were saying.  They
6  told them if they didn't tell that they had done it,
7  that the Feds would get involved and --
8    A.  I didn't say that either.
9    Q.  Didn't imply it?
10    A.  It was just, "Tell me the truth.  Tomorrow
11  the Feds are coming in.  They take over.  I'll help
12  you out right now with what you tell me."
13    Q.  Have you ever been arrested for anything you
14  haven't done?
15    A.  No.
16    Q.  Would it bother you if your children were
17  arrested and held and treated the way that these kids
18  were treated if they had not committed the crime?
19        MR. ANGELL:  Object to the form.
20        Go ahead and answer, if you can.
21        THE WITNESS:  It would bother me for, one, if my
22  kids got arrested because -- discipline on my own type
23  thing as a parent.  But as far as the way these guys
24  got treated, I wasn't ever made aware of any
25  mistreatment, other than, yeah, they didn't do it.

Page 121

1  But as far as the treatment, the word I got is it  was
2  respectful all the way around on both sides.
3    Q.  (BY MR. RAMMELL)  Have you ever had a rifle
4  pointed at your head?
5    A.  I've been shot at and guns pointed towards
6  my but not to my head, no.
7    Q.  Is that a traumatizing event?
8    A.  I train for it.  It's an awkward event, but
9  traumatizing, no.
10    Q.  You don't think that having someone point a
11  rifle at your head is traumatizing?
12    A.  It could be traumatizing.  But the question
13  was towards me, no.  But to them, that never had been
14  through the training that I've had and seen stuff I've
15  seen --
16    Q.  You can understand why they would be upset;
17  correct?
18        MR. ANGELL:  Object to the form.  Calls for
19  speculation.
20        THE WITNESS:  I can't talk for them but...
21    Q.  (BY MR. RAMMELL)  Didn't ask you to.  My
22  question was:  You would understand why someone in
23  their position would be awful upset and traumatized,
24  wouldn't you.
25        MR. ANGELL:  Same objection.