Daniel L. Steele (6336)
Grant M. Sumsion (6445)
SUMSION STEELE & CRANDALL
545 E, University Parkway, Suite 200
Orem, UT 84097
Telephone: (801) 426-6888
Email: dan@sumsionsteele.com
      grant@sumsionsteele.com

Bron Rammell (ID State Bar No. 4389)
Andrew Hart (ID State Bar No. 10714)
MAY, RAMMELL & WELLS, CHARTERED
216 W. Whitman
P.O. Box 370
Pocatello, Idaho 83204-0370
Email: bron@mrwlaw.net
Email: andrew@mrwlaw.net

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| NEHEMIAH MCFARLIN and ATOATASI FOX,<br><br>        Plaintiffs,<br><br>vs.<br><br>BOX ELDER COUNTY; BOX ELDER COUNTY SHERIFF'S OFFICE; ADAM WALKER, individually; JUSTIN ZILLES, individually; STEVEN BERRY, individually; Z. MOORE, individually; SHANE NEBEKER, individually; L. MAUGHAN, individually; ONEIDA COUNTY; ONEIDA COUNTY SHERIFF'S OFFICE; SHERIFF JEFF SEMRAD, individually; DETECTIVE PATSY SHERMAN, individually; and JOHN and JANE DOES I-X, individually,<br><br>        Defendants. | Case No.1:18-cv-00156-DAK-CMR<br><br><br>**REPLY TO BOX ELDER COUNTY DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT**<br><br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiffs Nehemiah Mcfarlin and Atoatasi Fox hereby Reply to Box Elder County, Box Elder County Sheriff's Office, Sergeant Steven Berry, Detective Zachary Moore, and Lawrence Maughan's Opposition to Plaintiffs' Motion for Leave to Amend as follows:

## REPLY

### I. LEGAL ARGUMENT

Federal Rule of Civil Procedure 15(a)(2) instructs a court to "freely give leave" to a plaintiff to amend his complaint "when justice so requires."[1] In this case, Plaintiff Nehemiah McFarlin ("Mr. McFarlin") and Atoatasi Fox ("Mr. Fox") (collectively "Plaintiffs") have been able to ascertain, or clarify, additional facts, and identify additional defendants after conducting initial discovery.[2] These amended allegations add specificity and clarify Plaintiffs assertions.[3]

Pursuant to F.R.C.P. 15, a plaintiff may amend his complaint 21 days after a responsive pleading, but only with the opposing party's consent, or leave from the court.[4] "The court should freely give leave when justice so requires."[5] If the court determines that the amended complaint would be futile, it may deny leave to amend.[6] It seems likely the denial of the right to amend is discretionary (as opposed to mandatory) in order to discourage premature determinations of futility.

---

[1] FRCP 15(a)(2).
[2] *See* Plaintiffs' Proposed Amended Complaint.
[3] *See Id.*
[4] F.R.C.P. 15(a)(2).
[5] F.R.C.P. 15(a)(2).
[6] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 11126 (10th Cir. 1997) emphasis added.

### A. Chief Deputy Ward is not entitled to qualified immunity

The Box Elder Defendants argue that it would be futile to amend Plaintiffs' complaint to include Chief Deputy Ward as a Defendant because he is entitled to qualified immunity.[7] The single basis of this argument is the assertion that probable cause for Plaintiffs' arrest existed at the time they were arrested.[8]

A government official may not claim qualified immunity if that official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the Plaintiff…"[9] A right is clearly established when a reasonable officer would know that his conduct is unlawful.[10]

A police officer violates a person's clearly established right when they arrest said person without probable cause.[11] For the purposes of determining qualified immunity, probable cause only exists if "an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause."[12] An officer cannot rely on an unreasonable mistake of fact to establish probable cause.[13] Furthermore, an officer must consider any "readily available exculpatory evidence" that could reasonably

---

[7] Box Elder County Defendants' Memorandum in Opposition to Plaintifffs' Motion for Leave to Amend Complaint pg. 4–5.
[8] Box Elder County Defendants' Memorandum in Opposition to Plaintifffs' Motion for Leave to Amend Complaint pg. 4–5.
[9] *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982), internal quotations, punctuation, and formatting omitted.
[10] *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc).
[11] *See Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1308–12 (10th Cir. 2015).
[12] *Id.* at 1310, quoting *Cortez*, 478 F.3d at 116.
[13] *Id.* at 1310.

be ascertained.[14] This means that an officer must make a reasonable inquiry into the available evidence before engaging in a warrantless arrest.[15]

In *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301 (10th Cir. 2015), the Tenth Circuit clarified the standard by which an officer must ascertain whether probable cause exists to justify a warrantless arrest and seizure.[16] In that case, an officer conducted a felony stop on the Maresca family because she mistakenly believed that their vehicle had been stolen.[17] While following the Marescas, the arresting officer entered their license plate number into her onboard computer.[18] However, she accidentally entered the wrong license plate number, and was provided with a warning that the vehicle whose number she had entered was stolen.[19]

The officer's onboard computer described the stolen vehicle as a red or maroon 2009 four-door Chevy sedan with expired plates.[20] The Maresca's were driving a red 2004 Ford pickup truck with current plates.[21] The court noted that these differences were "<u>not</u> minor."[22]

Despite this available information, the officer stopped and arrested the Marescas family without taking any additional steps to confirm that their vehicle was stolen.[23]

---

[14] *Id.*
[15] *Id.*
[16] *See Maresca*, 804 F.3d 1301.
[17] *See Id.* at 1304–05.
[18] *See Id.* at 1304.
[19] *See Id.* at 1305.
[20] *See Id* at 1304.
[21] *See Id.*
[22] *See Id.*
[23] *See Id.* at 1305.

During the arrest, Mr. Maresca asserted his innocence and pleaded with the officers to check his license and registration to confirm that his vehicle was not stolen.[24] However, the arresting officers ignored this request and did not even bother to interview the Marescas to ascertain any of the "readily available exculpatory evidence."[25]

In *Maresca*, the Tenth Circuit held that the arresting officer did not have probable cause to arrest the Marescas.[26] The court held that even though the Maresca's vehicle was the same color as the stolen vehicle, and the officer error in putting in the wrong license plate number was not unreasonable; she still was not entitled to turn a blind eye to the exculpatory evidence she had available to her.[27] The Court noted that the officer should have taken note of the fact that the stolen vehicle did not match the description of the stolen vehicle, should have verified the stolen vehicle report with dispatch, and should have interviewed the Marescas and investigated their claims of innocence.[28] This Tenth Circuit case was issued more than a year before the wrongful arrest in this case, and Defendants had ample notice that what they did violated the Fourth Amendment.

In this case, Defendants argue that Chief Deputy Ward had knowledge that would justify probable cause for Plaintiffs' arrest and therefore, he is entitled to qualified immunity. However, this is simply not the case as Dale Ward ignored the exculpatory evidence that was available to him, that would have vitiated probable cause. Therefore, he is not entitled to qualified immunity.

---

[24] *See Id.*
[25] *See Id.* at 1311.
[26] *See Id.* at 1311–12.
[27] *See Id.*
[28] *See Id.*

Through depositions, Plaintiffs have learned that Chief Deputy Dale Ward was in frequent communication with Steve Berry on the day that Plaintiffs were arrested.[29] During that time he acted on behalf of Sheriff Potter. Plaintiffs now know that some of the acts and decisions that Plaintiffs initially attributed to Sheriff Potter, were actually taken by Chief Deputy Ward; either on his own, or under the Sheriff's direction.

Plaintiffs have alleged that while Dale Ward was not physically present at the arrest, he and/or Sheriff Potter was in regular contact with Defendant Steve Berry who actually conducted the arrest.[30] Plaintiffs have also alleged that Steve Berry informed either Dale Ward or Sheriff Potter, or both about the circumstances of the arrest as they were known at the time.[31] Furthermore, Plaintiffs have alleged that Chief Deputy Ward had access to the information about the robbery suspect, contained in the ATL which had been broadcast earlier that day.[32]

From that ATL, and Officer Berry's updates, Dale Ward knew or should have known that the robbery suspect was a single black male.[33] He also knew, or should have known that the suspect's vehicle was described as: (1) white, (2) four-door, (3) a Toyota, (4) with no plates, (5) missing hubcaps, (6) and extensive front end damage.[34] As Dale Ward was made aware of the facts he would have known that Plaintiffs' vehicle was

---

[29] *See* Transcript of the Deposition of Dale Ward as the 30(b)(6) Deponent for Box Elder County Sheriff's OFfice. Dale Ward's deposition was taken on December 18, 2020 and Plaintiff has not yet received a transcript of said deposition.
[30] *See* Second Amended Complaint and Demand for Jury Trial pgh 66– 71.
[31] *See* Second Amended Complaint and Demand for Jury Trial pgh 71.
[32] *See* Second Amended Complaint and Demand for Jury Trial pgh 28–37.
[33] *See* Second Amended Complaint and Demand for Jury Trial pgh 29, 34.
[34] *See* Second Amended Complaint and Demand for Jury Trial pgh 34–36.

white, but it had two doors and not four; it was a Camarro and not a Toyota; it had a dealer plate; it had spoke rims and was not missing hubcaps; and though it did have front end damage, it would have been readily available to Defendants to verify that the damage had been sustained between Malad and Box Elder as Plaintiffs claimed if they had just gone and checked where the guard rail had been hit.

Dale Ward is not excused in ignoring the exculpatory evidence that was readily available. Even if he was not present on the scene, he had enough information available to him to see that Plaintiffs' vehicle did not match the description of the suspect's vehicle other than it was white.

Additionally, Plaintiffs provided the arresting officers' with several sources which could have been contacted to verify their alibis. Dale Ward would have also been informed that Plaintiffs vehicle was searched and no evidence of the robbery was ever found.[35] All of this exculpatory evidence vitiates any probable cause that could have existed and should not have been ignored by Dale Ward. Accordingly, because a reasonable officer would not have concluded that probable cause existed at the time, Dale Ward is not entitled to qualified immunity, and Plaintiffs' proposed amendments are not futile.

---

[35] *See* Second Amended Complaint and Demand for Jury Trial pgh 116.

**B. The new allegations related to Bowcutt's affidavit demonstrate a constitutional violation by the Box Elder County Defendants.**

The Box Elder County Defendants argue that Bowcutt reasonably relied on Patsy Sherman's testimony, therefore he did not violate Plaintiffs' constitutional rights by signing an affidavit in which he claimed her factual assertions as true.

An affiant violates the Fourth Amendment when he "knowingly and intentionally, or with reckless disregard for the truth" provides false statements in an affidavit for probable cause in support of a warrant application.[36] An omission of a material fact is also a constitutional violation if the inclusion of those facts would diminish probable cause.[37] In fact, "[r]ecklessness may be inferred from omission of facts which are clearly critical to a finding of probable cause."[38]

In this case, Defendants argue that a police officer may rely on the observations, statements, and conclusions of their fellow officers as long as said reliance was objectionably reasonable.[39] They then claim that Bowcutt explicitly states that his affidavit in support of probable cause was based on information provided to him by Patsy Sherman, who was a reliable source.[40] However, Bowcutt's actions in this matter were not reasonable, for two reasons. First, Bowcutt did more than rely on Patsy Sherman's comments to support his affidavit, he essentially signed an affidavit and allowed her to

---

[36] *Franks v. Delaware*, 438 U.S. 154, 155 (1978).
[37] *United States v. Basham*, 268 F.3d 1199, 1204 (10th Cir. 2001).
[38] *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th cir. 1990) internal citations omitted.
[39] Box Elder County Defendants' Memorandum in Opposition to Plaintifffs' Motion for Leave to Amend Complaint pg. 6.
[40] Box Elder County Defendants' Memorandum in Opposition to Plaintifffs' Motion for Leave to Amend Complaint pg. 6.

fill in the blanks and then submitted said affidavit without conducting any independent review or investigation of the situation. Second, it was not necessary for Bowcutt to rely on Patsy Sherman's information at all as he could have easily gone and looked at Mr. McFarlin's vehicle himself and thus avoided submitting an affidavit that contained false and misleading information concerning the vehicle and omitted several key characteristics.

To begin with, the extent to which Bowcutt relied on Patsy Sherman's information was not reasonable. Patsy Sherman describes in her deposition that she actually typed in the majority of the information provided in the affidavit and Austin Bowcutt who simply signed it.[41] Austin Bowcutt did not conduct any independent investigation of the facts nor looked into the veracity of what Patsy Sherman claimed to be true.[42] Still, Bowcutt signed the affidavit and asserted to the court that the information contained therein was true and correct.[43] Bowcutt submitted this affidavit with his signature despite the fact that the information provided by Sherman, and adopted by Bowcutt in his affidavit, was riddled with false or misleading statements, as well as omissions of several facts that would have vitiated any probable cause that existed.[44]

---

[41] *See* Deposition of Patsy Sherman pg. 142–45.
[42] *See* Transcript of the Deposition of Austin Bowcutt. Austin Bowcutt's deposition was taken on December 17, 2019 and Plaintiff has not yet received a transcript of said deposition.
[43] *See* Affidavit for Search Warrant, Exhibit A to Oneida County Defendant's Memorandum in Opposition (Dkt. No. 75-1).
[44] See Plaintiffs' Reply to the Oneida County Defendants Memorandum in Opposition to Plaintiff's Leave to Amend (Dkt. 80).

Additionally, it was not reasonable for Bowcutt to rely on Patsy Sherman's assertions alone, as he could have easily verified the same information had he reviewed the evidence that was readily available. There is no excuse as to why Bowcutt would rely solely on Sherman, when he had the means to quickly verify the information that he asserted as true in his affidavit. After all, the Camaro was being held in the sally port of the Box Elder Sheriff's Department. Bowcutt could have easily looked at the vehicle to have seen that it was a four door instead of a two door; a fact that was left out of his affidavit.[45] Or that the vehicle actually did not have a temporary license sticker in the window as his affidavit claimed.[46] He could have also seen that the vehicle had black spoked wheels that were not designed for hubcaps, so as to avoid the misleading statement that the car had black wheel rims with no hubcaps, which was contained in his affidavit.[47]

Furthemore, had he discussed the matter with Steve Berry, the officer who arrested Plaintiffs and a fellow Box Elder County Sheriff's employee, he would have learned that the vehicle was searched at the time of the arrest and no evidence was found.[48] He would have also learned that Plaintiffs had provided multiple alibis that could have been easily corroborated.[49]

---

[45] See Affidavit for Search Warrant, Exhibit A to Oneida County Defendant's Memorandum in Opposition (Dkt. No. 75-1).
[46] See Affidavit for Search Warrant, Exhibit A to Oneida County Defendant's Memorandum in Opposition (Dkt. No. 75-1).
[47] See Affidavit for Search Warrant, Exhibit A to Oneida County Defendant's Memorandum in Opposition (Dkt. No. 75-1).
[48] See Second Amended Complaint and Demand for Jury Trial pgh 132.
[49] See Second Amended Complaint and Demand for Jury Trial pgh 133.

Accordingly, Bowcutt's actions were unreasonable and violated Plaintiffs' Fourth Amendment Rights. Bowcutt asserted to the Court that he had reason to believe that McFarlin's vehicle would contain evidence of the bank robbery. Though Defendants claim that he relied on Patsy Sherman's information, this reliance was unreasonable. It was unreasonable to the extent that he simply signed off on the affidavit without conducting any independent review or investigation. It was also unreasonable in that he did not need to rely on Patsy Sherman at all, as he easily could have looked at the vehicle himself and spoken with the arresting officer and thus avoided signing an affidavit that contained a false and misleading description of the vehicle and several key omissions about its characteristics. Therefore, Bowcutt violated Plaintiffs' Fourth Amendment rights.

The Box Elder County Defendants have also argued that the information that Sherman provided Bowcutt did not leave out any critical fact that would vitiate probable cause.[50] To support this argument, they have incorporated, and adopted by reference, the arguments and legal authority set forth in Defendant Oneida County's Memorandum in Opposition (DKT. No. 75), Subsection B., pages 5 through 10.[51] In response to this argument, Plaintiffs would refer to the Court to their arguments, legal authority, and exhibits, set forth in their Reply to the Oneida County Defendants Memorandum (DKT. 80), pages 6–12.

---

[50] Box Elder County Defendants' Memorandum in Opposition to Plaintiffffs' Motion for Leave to Amend Complaint pg. 7.
[51] *Id.*

DATED this 27th day of December, 2019.

                  MAY, RAMMELL & WELLS, CHTD.
                  *Attorneys for Plaintiffs*

                  */s/ Bron Rammell*
                  BRON RAMMELL

## CERTIFICATE OF SERVICE

I certify that on this date a copy of the foregoing *Plaintiff's Reply to Box Elder County's Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend Complaint* was served on the following named person(s) at the address(es) shown and in the manner indicated:

| | |
|---|---|
| BLAKE G. HALL, ESQ.<br>SAM L. ANGELL, ESQ.<br>HALL ANGELL & ASSOCIATES, LLP<br>1075 S Utah Avenue, Suite 150<br>Idaho Falls, Idaho 83402<br>bgh@hasattorneys.com<br>sla@hasattorneys.com | ☐ U.S. Mail<br>☐ Facsimile:<br>☐ Hand Delivered<br>☒ Email<br>☒ CM/ECF |
| Stephen F. Noel, Esq.<br>SMITH KNOWLES PC<br>2225 Washington Blvd, Ste 200<br>Ogden, UT 84401<br>Email: snoel@smithknowles.com | ☐ U.S. Mail<br>☐ Facsimile:<br>☐ Hand Delivered<br>☒ Email<br>☒ CM/ECF |

DATED this 27th day of December, 2019.

                  By: */s/ Bron Rammell*
                      May, Rammell & Wells, Chartered

## **CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT**

      I certify that Plaintiff's Reply to Oneida County Defendants' Objection to Motion for Leave to Amend Complaint complies with the word-count limit of 2,500 words as established by local rule DUCivR 7-1(a)(3). The final word count of Plaintiffs' Response is 2,144.

DATED this 27th day of December, 2019.


                By: _/s/ Andrew Hart_
                    May, Rammell & Wells, Chartered

EXHIBIT B

STATE OF IDAHO    )
                  :ss
County of Bannock )

Andrew Hart, after being duly sworn, does depose and state:

1. I am counsel for Plaintiff Nehemiah McFarlin, in this action.
2. Attached to this affidavit is a true and correct copy of pages from the transcript of Patsy Sherman's deposition.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

DATED this 27th day of December, 2019.

_____
ANDREW N. HART

SUBSCRIBED AND SWORN to before me this 27th day of December, 2019

[SEAL]

_____
NOTARY PUBLIC FOR IDAHO
Residing at: Pocatello
My Commission Expires: 4-10-2023

Page 142

1 Search Warrant" and the "Return to Search Warrant"?
2  A. Yes.
3  Q. Okay. And this is the document that we have
4 been talking about that you prepared in conjunction
5 with Sergeant Austin Bowcutt?
6  A. Yes.
7  Q. All right. So let's go through the details
8 of that warrant here for a second. You are stating
9 that -- you are making these statements under oath;
10 correct?
11  A. Yes.
12  Q. And, so, first of all, you describe that
13 there was a vehicle, the Chevy Camaro, that was white
14 in color with black rims. It was in the sally port at
15 the sheriff's office; right?
16  A. Yes.
17  Q. And you say there is certain evidence:
18 surgical gloves; shoes; clothing; spiral bound
19 notebook; currency; sunglasses; and some other things,
20 including brown plastic grocery bags; and that the
21 evidence was unlawfully acquired or is unlawfully
22 possessed?
23  A. Yes. Either -- unlawfully acquired or is
24 unlawfully possessed, yes.
25  Q. And so are you suggesting then by that

Page 143

1 statement that there was that evidence in the car that
2 you had found?
3  A. No. This is evidence that we were looking
4 for. When you do these affidavits in Box Elder
5 County, it's kind of fill-in-the-blank. So they are
6 electronic and as you go through it, you fill in the
7 blanks here.
8  Q. Okay. So these are things that you
9 indicated you were looking for?
10  A. Yes.
11  Q. Okay. Were any of those items found?
12  A. There was some currency found.
13  Q. Sure.
14  A. But other than that -- and I believe there
15 were some sunglasses and shoes and clothing, but they
16 were not the currency, the sunglasses or the shoes or
17 clothing we were looking for.
18  Q. Right. And you say that all of those are
19 evidence of illegal conduct; right?
20  A. Could be evidence of illegal conduct.
21  Q. Okay. So let's get into the body of the
22 affidavit that begins on page 2. This is -- it all
23 refers to Austin Bowcutt. It doesn't refer to you as
24 the person who's the affiant.
25    Can you explain why?

Page 144

1  A. Because he is the Utah officer. And we are
2 applying for this search warrant in Utah; so I have to
3 kind of work underneath him to do that. So he
4 basically gets this information from me. I'm telling
5 it to him, but what he did is actually have me type
6 the information so that I'm giving it firsthand. So,
7 yeah.
8  Q. And did you instruct him what to write in
9 the affidavit then?
10  A. He wrote this first part. I actually typed
11 in the part that starts where it says "Lieutenant
12 Patsy Sherman has been an employee at the Oneida
13 County Sheriff's Office for 19 years."
14  Q. Okay. Now, with respect to this interaction
15 that you guys are engaging in, are there any written
16 policies within the Oneida County Sheriff's Department
17 that deal with how to interact with across state
18 agencies and investigations of crimes like the bank
19 robbery that occurred here?
20  A. No written policies. It's a common practice
21 with law enforcement.
22  Q. Okay. Can you describe what the policy is?
23  A. There is no written policy, but we work
24 together all the time. You know, we are 13 miles from
25 the border. A lot of things cross over back and forth

Page 145

1 between the two.
2  Q. Sure.
3  A. I don't have any arrest authority in Utah.
4 They don't have any arrest authority in Idaho. But
5 oftentimes criminals do travel from one state to the
6 other; so we work together to try to resolve those
7 crimes.
8  Q. And you understand that if there is not a
9 written policy, the practice can become a policy;
10 correct?
11  A. Yes.
12  Q. And so what I'm asking then is not whether
13 you do interact together, because I'm sure that is
14 true. I'm asking whether or not you have any specific
15 understanding of specific policies, whether written or
16 created by practice, that instruct how you are
17 supposed to interact with interstate agencies from
18 other states?
19  A. Can you be more specific? I mean, what do
20 you mean as interact? Like, we work under their -- we
21 kind of work under their authority, yeah. Is that
22 what you are referring to?
23  Q. Yes, in part. That's a good example of what
24 I'm asking you about.
25    How do you know whose authority you are