Daniel L. Steele (6336)
Grant M. Sumsion (6445)
SUMSION STEELE & CRANDALL
545 E, University Parkway, Suite 200
Orem, UT 84097
Telephone: (801) 426-6888
Email: dan@sumsionsteele.com
        grant@sumsionsteele.com

Bron Rammell (ID State Bar No. 4389)
MAY, RAMMELL & WELLS, CHARTERED
216 W. Whitman
P.O. Box 370
Pocatello, Idaho 83204-0370
Email: bron@mrwlaw.net

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| NEHEMIAH MCFARLIN and ATOATASI FOX, | Case No.1:18-cv-00156-DAK-CMR |
| Plaintiffs, | |
| vs. | **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| BOX ELDER COUNTY; BOX ELDER COUNTY SHERIFF'S OFFICE; ADAM WALKER, individually; JUSTIN ZILLES, individually; STEVEN BERRY, individually; Z. MOORE, individually; SHANE NEBEKER, individually; AUSTIN L. BOWCUTT, individually; SHERIFF KEVIN POTTER BOX ELDER COUNTY, individually; DALE WARD individually; ONEIDA COUNTY AND ONEIDA COUNTY SHERIFF'S OFFICE; SHERIFF JEFF SEMRAD, individually; DETECTIVE PATSY SHERMAN, individually; DOUG WILLIAMS, individually, and JOHN and JANE DOES I-X, individually, | Judge Dale A. Kimball

Magistrate Judge Cecilia M. Romero |
| Defendants. | |

COME NOW Plaintiffs Nehemiah McFarlin and Atoatasi Fox, by and through their attorneys of record, Bron Rammell and Sumsion, Steele & Crandall, and hereby file this *Amended Complaint* against Defendants as follows:

## JURISDICTION AND PARTIES

1.    This Court has jurisdiction over this action under the laws of the State of Utah and the United States, including 42 U.S.C. §§1983 and 1988.

2.    At all times relevant to this matter, Plaintiffs Nehemiah McFarlin and Atoatasi Fox ("McFarlin" and "Fox," respectively) were residents of the State of Idaho.

3.    Plaintiffs were improperly arrested in Utah, and subjected to inappropriate treatment, including discrimination, while they were physically located in Utah, and Utah has jurisdiction over the claims in this *Complaint*.

4.    Defendant Box Elder County was and is a political subdivision of the State of Utah.

5.    To the best of Plaintiffs' knowledge and belief, at all times relevant to this action Defendants Adam Walker, Justin Zilles, Steven Berry, Z. Moore, Shane Nebeker, Austin L. Bowcutt, Kevin Potter, Dale Ward, and John and Jane Does I-V were residents of Box Elder County, State of Utah ("Utah Defendants").

6.    Upon information and belief, Defendants Adam Walker, Justin Zilles, and Shane Nebeker were employed by the Utah Highway Patrol at all times relevant.

7.    Upon information and belief, Defendants Steven Berry, Z. Moore, Austin L. Bowcutt, Kevin Potter, and Dale Ward were employed by the Box Elder Sheriff's Office at all times relevant.

8.    Defendants Adam Walker, Justin Zilles, Steven Berry, Z. Moore, Shane Nebeker, Austin L. Bowcutt, and Kevin Potter are sued in their individual capacities, pursuant to 42 U.S.C. §1983.

9.    Defendants John and Jane Does I-V are sued in their individual capacities and consist of individuals who subjected Plaintiffs to wrongful arrest and other illegal and inappropriate actions arising out of or associated with the wrongful arrest, including discrimination; whose full names are not known at this time.

10.   Defendant Oneida County was and is a political subdivision of the State of Idaho.

11.   To the best of Plaintiffs' knowledge and belief, at all times relevant to this action Defendants Sheriff Jeff Semrad, Detective Patsy Sherman, Sgt. Doug Williams, and John and Jane Does VI-X were residents of Oneida County, State of Idaho ("Idaho Defendants").

12.   Upon information and belief, Defendants Patsy Sherman, Doug Williams, and Jeff Semrad were employed by the Oneida County Sheriff's Office at all times relevant.

13.   Defendants Sheriff Jeff Semrad, Detective Patsy Sherman, Doug Williams, and John and Jane Does VI-X are sued in their individual capacities, pursuant to 42 U.S.C. §1983.

14.   Defendants John and Jane Does VI-X are sued in their individual capacities and consist of individuals who subjected Plaintiffs to wrongful arrest and other illegal and inappropriate actions arising out of or associated with the wrongful arrest, including discrimination; whose full names are not known at this time.

15. This action is brought pursuant to 42 U.S.C. §1983 and 1988.

16. Plaintiffs are entitled to attorney fees and costs pursuant to 42 U.S.C. §1988.

17. Venue is appropriate in the District Court of the Utah Federal Court, in Salt Lake City, Utah, as at least one Defendant resides in Box Elder County, State of Utah, and the acts giving rise to the complaint in this case generally occurred in Utah.

## FACTS

18. The preceding paragraphs are fully incorporated herein by this reference.

19. On or about December 14, 2016, Plaintiffs McFarlin and Fox had finished a semester of school at Idaho State University and were on their way home to enjoy the holidays with their families.

20. McFarlin was driving and Fox was a passenger in McFarlin's new 2017 two-door Chevy Camaro.

21. Their route home led them through Oneida County, Idaho and Box Elder County, Utah as they travelled along Interstate Freeway 15 ("I-15").

22. The roads were slick in spots, and about an hour into the drive they hit a slick patch, causing McFarlin to briefly lose control of the Camaro and hit something in the median of I-15 between Malad, Idaho and the Portage Exit in Box Elder County.

23. They pulled over, assessed the damage to the front of the Camaro, and decided to continue on their journey.

24. After traveling a few more miles they heard scraping noises and pulled over at the Portage Exit in Box Elder County Utah.

25. This time they decided to call AAA to come and look at and possibly retrieve the car because they weren't sure of the extent of the damage to the vehicle.

26. They safely pulled off the road at the exit to wait for AAA to arrive.

27. Fox, who had been visiting with his mother and girlfriend while on the trip was in the middle of FaceTiming his girlfriend when they were suddenly and unceremoniously confronted by and ordered out of the Camaro at gunpoint by several police officers; Defendants Steve Berry ("Berry"), Justin Zilles ("Zilles"), and Adam Walker ("Walker").

28. Earlier that day, the Oneida County Sheriff's Office had broadcast that an armed robbery had occurred at the US Bank in Malad, Idaho around 3:00 pm.

29. The suspect was described as a black male, driving a four-door white Toyota passenger car with no window tinting, 3 missing hubcaps, no license plate and front end damage.

30. A US Bank teller, who was present at the time of the robbery informed one or more of the Oneida County Defendants that she could see in the car driven by the robber and that no passengers were seen in the car.

31. The Oneida County Defendants also spoke with employees from the tire store across the street who claimed to have seen, and spoken with, a man, believed to be the suspect in a white car, prior to the bank robbery.

32. The suspect was further described as wearing a black hooded sweatshirt and sunglasses.

33. The suspect was difficult to describe because his face was largely covered by the hood and sunglasses.

34. The Oneida County Sheriff's Department broadcast an attempt to locate ("ATL") on a small white four-door passenger car with no license plate, driven by a single black male.

35. Some witnesses claimed that the suspect's vehicle had a temporary registration sticker in the back window, unlike Plaintiffs' vehicle which only had a temporary dealer's license plate and no sticker.

36. The ATL was later updated to a white Toyota four-door with no license plate and no hub-caps and extensive front end damage.

37. Box Elder County Sheriff's Office and Utah Highway Patrol received the ATL and disseminated the information to their deputies and officers.

38. While Plaintiffs were waiting for AAA, a citizen allegedly called Oneida County Dispatch to report that her nephew had supposedly seen the robbery suspect and his vehicle on the side of the road. He reported seeing two black males in a white Toyota four-door with extensive front end damage and no plates at the Portage Exit.

39. Oneida County Defendants never spoke to the witness directly, nor solicited any further information about him. Furthermore, they never questioned how the caller, or her nephew, knew about the bank robbery or the ATL which had only happened a few hours ago.

40.     Without any further follow up, Oneida County reported this information to Box
        Elder County.

41.     Steve Berry was the first to arrive.

42.     As Berry made his initial pass of the Plaintiffs' vehicle, he noted that the windows
        were tinted to the point he could not see who was inside, though he knew that two
        black males had been reported with the vehicle.

43.     Neither the ATL nor any witness who saw the robbery suspect's vehicle reported
        tinted windows; in fact one of the tellers reported being able to see into the
        vehicle clearly enough to see the driver as the only occupant.

44.     Adam Walker and Justin Ziles arrived soon after to assist Berry.

45.     These three were the first to note that while Plaintiffs were allegedly the same
        race as the suspect,  Mr. McFarlin's Camaro did not match the description of the
        suspects vehicle.

46.     As a result, Defendants called to verify the description on the ATL and searched
        the area for other vehicles.

47.     Defendants Walker, Zilles, and Berry then coordinated together to create a plan of
        action and initiated contact with Plaintiffs

48.     Berry, Walker, and Ziles witnessed Plaintiffs parked in McFarlin's Camaro on the
        side of the road with its hazards on, like so many other vehicles that had slid off
        the road that day due to the snow storm.

49.     Despite the fact that three police cars had converged a hundred or so yards behind
        Plaintiffs, Plaintiffs showed no sign of resistance, flight, or guilt.

50.   McFarlin's Camaro did not match the vehicle described in the ATL, no weapon had been reported with the robbery, and there was no reason to believe that Plaintiffs would resist or pose any danger to Defendants.

51.   Still, Defendants decided to do a "felony stop" upon Plaintiffs.

52.   Berry, Walker, and Ziles all raced their vehicles towards the back of McFarlin's Camaro with their overhead lights activated.

53.   Walker ordered Plaintiffs out of the car, one at a time, and instructed them to walk backwards with their hands above/behind their heads, while Steve Berry and Justin Zilles pointed their rifles and pistols at them.

54.   Defendants then handcuffed and physically assaulted and searched Plaintiffs and informed them they were under arrest for robbing a bank in Malad, Idaho.

55.   The force used on Plaintiffs under the circumstances was excessive.

56.   As soon as Plaintiffs were able to communicate safely, they began trying to explain that they were not involved in any robbery and not only offered complete cooperation, but also provided a number of ways Defendants could verify they could not have committed the robbery.

57.   Plaintiffs even allowed Defendants to search their vehicle, which only contained their luggage; further corroborating their story that they were traveling home for the holidays.

58.   Despite all this evidence showing that Plaintiffs were not bank robbers, Defendants arrested them for the robbery within fifteen minutes of ordering out of their vehicle at gunpoint.

59.     The fact that Plaintiffs had been arrested by this point is confirmed through a conversation that Berry had with Walker and Zilles.

60.     During this conversation, the three discussed possible means to search McFarlin's Camaro, when Berry stated that they can search the car as part of a search incident to arrest.

61.     These three searched McFarlin's Camaro, going as far as to open the luggage which was in the back, and found no evidence that would tie Plaintiffs to the robbery.

62.     Berry, Walker, and/or Zilles made an inventory of what was found and passed this information onto the other Defendants as they arrived at the scene.

63.     Sgt. Doug Williams, Patsy Sherman, Sheriff Semrad, and other officers from the Oneida County Sheriff's Office showed up shortly after Plaintiffs had been arrested.

64.     Shane Nebeker, Austin Bowcutt, and Z. Moore also arrived on the scene to assist in Plaintiffs' arrest, the search of Mr. McFarlin's vehicle, and Plaintiffs' transport to Jail.

65.     While the Defendants searched the car, they again questioned whether the description of the vehicle in the ATL matched Mr. McFarlin's Camarro.

66.     Shortly after Plaintiffs had been arrested, Steve Berry got on the phone with Sheriff Kevin Potter, or Chief Deputy Dale Ward, of the Box Elder County Sheriff's Department and informed him that they had some "issues."

67. He informed Sheriff Potter, or Chief Deputy Dale Ward, that he and the other officers, including the Oneida Sheriff's Office, had apprehended the bank robbers and that they would later bring Plaintiffs' to the Box Elder County Jail for interrogation.

68. However, the Federal Bureau of Investigation explained to the officers present that their agency would not arrest the Plaintiffs without a warrant.

69. Therefore, the Defendants planned to have Oneida County Sheriff Jeff Semrad get one of his prosecuting attorneys to obtain a warrant for Plaintiffs, based on information the Defendants would give him.

70. No evidence of the robbery had been found at that point.

71. Sheriff Potter, and or Dale Ward, were aware of the circumstances surrounding the arrest, and provided instruction to Steve Berry about how to proceed, including to hold Plaintiffs under arrest.

72. Sheriff Semrad, also worked with the Utah Defendants to arrange for the Plaintiffs to be brought to the Box Elder County jail for interrogation.

73. Steve Berry told the present officers that because the Plaintiffs were arrested in Box Elder County, they would need to be taken to the Box Elder County jail.

74. He then asked Sheriff Potter, or Dale Ward, if he and the other officers could transport the Plaintiffs, and their vehicle, to the Box Elder County Jail without a warrant.

75. Sheriff Potter is an elected official and sets policy for the Box Elder County Sheriff's department.

76.   Sheriff Potter knew, or should have known, based on the information exchanged, that Plaintiff's had a clear alibi and evidence that they were not the robbers and that the motivating factor in detaining, searching, seizing and/or arresting Plaintiffs was the color of their skin.

77.   Instead of acting to stop the illegal activity of Defendants, Sheriff Potter, Dale Ward and the Box Elder County Defendants simply deferred to the Idaho Defendant's illegal actions.

78.   Their decision to defer to the illegal actions of the Idaho Defendants was the result of their customs, practices and/or policies and/or a failure to adequately train its employees.

79.   Sheriff Semrad is an elected official and sets policy for Oneida County Sheriff's Office.

80.   Sheriff Semrad knew, or should have known, based on the information that he ascertained, and was provided to him, at the scene of Plaintiffs' arrest, that Plaintiffs could not be the robbers, that no probable cause existed to link them to the robbery, and that the motivating factor in detaining, searching, seizing and/or arresting Plaintiffs was the color of their skin.

81.   As the Sheriff of Oneida County, Sheriff Semrad had the ability to request that Plaintiffs be released by the Utah Defendants due to a lack of probable cause that Plaintiffs were the bank robbers.

82. Sheriff Semrad had instructed both Sherman and Williams that he would be allowing them to run the investigation into the Malad bank robbery as he would soon be leaving his office as Sheriff.

83. Both Williams and Sherman, as the two law enforcement officials leading the investigation into the Malad bank robbery, had the ability to request that Plaintiffs be released by the Utah Defendants due to a lack of probable cause that Plaintiffs were the bank robbers.

84. Sheriff Semrad, Patsy Sherman, and Doug Williams also failed to stop the illegal arrest of Plaintiffs, and allowed the Utah Defendants to act illegally on their behalf.

85. Their decision was the result of Oneida County's customs, practices and/or policies and/or a failure to adequately train its employees.

86. Steve Berry informed Sgt. Doug Williams that the Plaintiffs would be transported to Box Elder County Sheriff's office where a space would be set up for Williams to interrogate the suspects.

87. Steve Berry transported Plaintiff Atoatasi Fox in his vehicle to the Box Elder County Jail.

88. Justin Zilles transported Plaintiff Nehemiah McFarlin in his vehicle to the Box Elder County Jail.

89. Neither McFarlin nor Fox was a participant in the robbery.

90. Neither McFarlin nor Fox was in the immediate Malad area at the time of the robbery.

91.    Based on the circumstances, the things the Defendants said and did, and the way they were treated throughout the detention, seizure, and arrest, it was obvious to Plaintiffs that the color of their skin was the motivation behind the stop, arrest, and treatment.

92.    This behavior continued to be exhibited by all of the Defendants until finally, the evidence was so overwhelming that Plaintiff's had to be released.

93.    Plaintiffs tried to explain to Defendants why they were there and offered proof that they could not have been involved in the robbery of the US Bank in Malad that afternoon.

94.    The Defendants knew or, shortly after initiating contact with Plaintiffs, should have known that Plaintiffs did not, and could not have participated in the bank robbery.

95.    Both McFarlin and Fox offered evidence of their prior auto accident, calls to AAA, and other information clearly showing that they could not have been the robbers of the Malad bank.

96.    Defendants disregarded the information and evidence that McFarlin and Fox offered, and continued the arrest of McFarlin and Fox without probable cause.

97.    The Idaho Defendants participated in the unlawful arrest in violation of the Fourth Amendment of the United States Constitution.

98.    McFarlin and Fox were transported in handcuffs to the Box Elder County jail.

99.    McFarlin and Fox were both booked into the jail and were told they would eventually be extradited to Idaho.

100. Throughout the ordeal, McFarlin and Fox were coerced, berated, and threatened, lied to, and informed that they were going to prison for a very long time.

101. McFarlin and Fox were denied any communication with family for several hours while in the Box Elder County Jail and while in the Utah and Idaho Defendant's custody and control.

102. During their interrogation Plaintiffs were visibly frightened and confused while Defendants demonstrated callous indifference.

103. When interrogated by Sgt. Williams, Mr. Fox provided a detailed recitation of where Plaintiffs had been earlier that day and how they had come to the Portage Exit.

104. Mr. Fox provided Sgt. Williams with several ways in which he could verify his alibi including: checking the bent guard rail where they had crashed, speaking with his girlfriend who he had been speaking to on FaceTime throughout the drive, and offering to allow Sgt. Williams the chance to check the location tracking on his phone.

105. Despite Mr. Fox's earnest and unwavering explanation, Sgt. Williams refused to listen and instead attempted to coerce Mr. Fox into providing a false confession.

106. Sgt. Williams then interrogated Mr. McFarlin using the same coercive tactics.

107. Sgt. Williams went as far as to lie to Mr. McFarlin, telling him that three witnesses had identified him as the robbery suspect.

108.    Despite the pressure from Sgt. Williams, Mr. McFarlin also provided a detailed alibi, and the same unwavering explanation of how Plaintiffs had arrived at the Portage Exit.

109.    Mr. McFarlin also provided Sgt. Williams with the names of several witnesses that could have verified his location at the time of the robbery.

110.    Sgt. Williams even used Plaintiffs' handwriting from their voluntary statements to compare to the robbery suspect's handwriting on the note left at the scene of the robbery; neither was a match.

111.    Despite all of this evidence to support the Plaintiffs' innocence, Sgt. Williams and the other involved Defendants refused to release Plaintiffs and continued the coercive interrogation until Plaintiff McFarlin asked to speak to an attorney.

112.    No Attorney was provided for Mr. McFarlin prior to his release.

113.    Sheriff Jeff Semrad was also present and actively participated during Plaintiffs' interrogation.

114.    At one point, he entered the interrogation room and lied to Mr. McFarlin, telling him that Mr. Fox had just confessed to robbing the bank.

115.    These interrogations took place in the Box Elder County Jail, under the supervision of Box Elder County, its Sheriff's office, and its Sheriff, and was consistent with their policies, customs and practices.

116.    Despite extensive interrogations and multiple searches of the vehicle, Defendants never found any evidence connecting Plaintiffs to the robbery.

117.    In fact, the morning of December 15th, Defendant Williams even went to the location where Mr. Fox and Mr. McFarlin had claimed to have crashed their vehicle. There he found a bent guard rail and a piece of what he believed to be Mr. McFarlin's Camaro.

118.    Williams reported this finding to Sheriff Semrad soon after finding the bumper and evidence just as described by the Plaintiffs.

119.    The Defendants continued to deprive Plaintiffs of their liberty and property in violation of Plaintiff's 4th and 14th Amendment rights, after it became quite obvious they had no legal basis to do so.

120.    The Defendants ignored obvious and compelling information and evidence, and participated in conjuring up information and evidence that was inaccurate, unreliable, untrustworthy, and untrue in order to continue their arrest and seizure of McFarlin and Fox.

121.    McFarlin's Camaro was seized at the scene.

122.    McFarlin's Camaro was searched, inventoried, and towed.

123.    No evidence of the robbery was found, further corroborating McFarlin and Fox's information.

124.    Despite the lack of evidence linking Plaintiffs to the robbery, Defendant Austin L. Bowcutt ("Bowcutt") submitted an affidavit to the Box Elder District Court as part of an application for a search warrant for McFarlin's vehicle.

125.    The factual allegations of this affidavit were provided by Patsy Sherman at the instruction of Sheriff Semrad.

126.  Despite not knowing the veracity of Patsy Sherman's factual allegations contained in the affidavit, Bowcutt signed and submitted an affidavit for a search warrant.

127.  Sherman/Bowcutt's affidavit stated that McFarlin's vehicle had a temporary license sticker in the rear window, which is false.

128.  Sherman/Bowcutt's affidavit stated that McFarlin's vehicle had black rim wheels and no hubcaps, which is technically true, but misleading, as it suggests to the reader that the vehicle should have hubcaps, but did not, when in fact Plaintiff's vehicle was never designed for hubcaps.

129.  Sherman/Bowcutt's affidavit stated that photos of the Plaintiffs were shown to the two bank tellers, and that one of the tellers identified the McFarlin as the robber. However, it fails to mention that the photos of the Plaintiffs were taken while they were handcuffed in the back of a police car and then shown to the witnesses alone, and not part of any type of lineup.

130.  Sherman/Bowcutt's affidavit also goes to great length to state that the witness was sure of her identification because she had paid attention to the robbers facial features and skin tones, but glosses over the fact that the suspect was described as wearing a hood and dark sunglasses which would have obstructed his facial features.

131.  Sherman/Bowcutt's affidavit fails to mention that Mr. McFarlin had already offered his consent for Defendants to search his car, his phone, and anything else they needed to prove his innocence.

132.    Sherman/Bowcutt's affidavit fails to mention that Mr. McFarlin's vehicle had already been searched and that no evidence of the crime had been found.

133.    Sherman/Bowcutt's affidavit fails to mention that both Plaintiffs, though separated since their arrest, gave the same plausible and unwavering alibi of where they had been on multiple occasions since their arrest, and that Doug Williams had verified part of their alibi by finding evidence that confirmed that Plaintiffs had wrecked their vehicle earlier that day.

134.    Patsy Sherman and Austin Bowcutt knowingly, or with reckless disregard for the truth, included false statements in the affidavit, and/or recklessly omitted from the affidavit information which, if included, would have vitiated probable cause.

135.    Bowcutt and Sherman applied for this warrant after the car had already been searched at the scene of the arrest and no evidence had been found.

136.    Bowcutt and Sherman provided false and/or misleading information to the court in an effort to bolster his claim that probable cause existed.

137.    Bowcutt and Sherman failed to inform the court that Plaintiffs had provided plausible and verifiable alibis for their whereabouts during the robbery.

138.    Bowcutt and Sherman failed to inform the court of the unreliable manner in which the witness identified Mr. McFarlin.

139.    Bowcutt and Sherman failed to inform the court that Defendants had already searched through the vehicle and had not found any evidence linking Plaintiffs to the robbery.

140.   Bowcutt and Sherman lied to the court by stating that it was likely that evidence of the robbery would be found in Plaintiffs' vehicle.

141.   Defendants also attempted to use conjured information and untrustworthy evidence against Plaintiffs to justify their arrest and detention, including an unreliable photo identification that resulted from an unnecessarily suggestive photo lineup conducted by Defendant Patsy Sherman.

142.   Sherman spoke with two of the witnesses of the robbery and showed each a single photograph of each Plaintiff, which had been taken by Sgt. Williams earlier that day while Plaintiffs were handcuffed in the back of police vehicles.

143.   The witness who was actually confronted by the robber could not identify either Plaintiff as the robbery suspect. Defendants did not ask the other identified witnesses from the tire store who spoke to the suspect face to face and saw his vehicle to make an identification of the Plaintiffs or the Camaro. This was not reported in any of the affidavits of probable cause.

144.   One witness falsely and unreliably identified Mr. McFarlin and told Sherman that she recognized the facial features and skin tone, even though the robber's face was hidden behind large dark sunglasses and a hoodie. The Defendants, including Sherman, knew that this identification was at best unreliable.

145.   Sheriff Semrad later admitted his knowledge of the suggestive photo array in an email to both Williams and Sherman, but complicitly, along with the other Defendants, ratified and adopted the action by failing to rectify the harm it had caused.

146. The procedure used, to show Plaintiffs' photographs to potential witnesses, was conducive to an irreparable mistaken identification.

147. Initially, these photos were taken by Doug Williams on his cell phone which was issued to him by Oneida County.

148. Williams sent these photos to Patsy Sherman's cell phone which was also issued to her by Oneida County.

149. Pursuant to Oneida County's policies and procedures, these photos should have also been uploaded to the County's computer system for safe storage.

150. According to Sheriff Semrad, these photos were properly stored on the County's system at the time he left the office shortly after the events alleged.

151. Plaintiffs filed a tort claim notice with the State of Idaho in June of 2017.

152. Defendants now claim that said photographs are no longer available for disclosure.

153. Defendants Williams and Sherman admit that the photos were stored on their phones at one time, but they claim that they have failed to save any copy.

154. Additionally, Defendants claimed that Sheriff Semrad and Doug Williams measured the tire tracks of the suspect's vehicle in the snow. These measurements and tracks were photographed by Sheriff Semrad and/or Doug Williams.

155. Defendants later claim that McFarlin's Camaro matched the measurements taken at the bank in Malad.

156. According to Sheriff Semrad, these photos were also stored on the County's computers at the time he left office.

157. Plaintiffs have requested these photos, but they have not been provided.

158. Defendants claim that these photos no longer exist.

159. The Idaho Defendants failed to take reasonable steps to secure and store the photos that were taken of Plaintiffs, and then shown to the witnesses, as well as the photos of the measurements of the suspect's tire tracks.

160. Their careless acts and omissions have prevented Plaintiffs from having access to these photographs which are integral to this action.

161. Defendants also misled and misrepresented facts to the prosecutor, to Plaintiffs, and to a judge in order to obtain a warrant and or to justify their improper and illegal acts.

162. Plaintiffs' families continued to try to communicate the fact that neither McFarlin nor Fox could have been the robbers to both Box Elder County and Oneida County.

163. Finally, and only after Oneida County Sheriff Jeff Semrad finally listened to and examined a few of the obvious and apparent facts, the Defendants began to question whether they had improperly arrested Plaintiffs.

164. Finally, recognizing that there was no probable cause to arrest McFarlin or Fox, they were released.

165. McFarlin and Fox were held, arrested, and threatened until their release at approximately 6:00 pm the next day, however.

166. Box Elder County and the Utah Defendants only released McFarlin and Fox upon Oneida County's request.

167.   Defendants began making excuses almost immediately and largely focused on the fact that there aren't many black people in Idaho.

168.   Though the Utah Defendants made the arrest without probable cause, they continued to seize and keep possession of McFarlin and Fox and their property.

169.   They ratified the illegal actions of the Idaho Defendants.

170.   The Utah Defendants supported the illegal arrest and continuing violations of McFarlin and Fox's rights by their actions and words.

171.   Box Elder County and the Utah Defendants' actions violated McFarlin and Fox's constitutional rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution.

172.   Oneida County and the Idaho Defendants' actions violated McFarlin and Fox's constitutional rights by encouraging and participating in the arrest without probable cause and the unlawful continued seizure of Plaintiffs and their property pursuant to the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

173.   As a result of Defendants' actions, both McFarlin and Fox were damaged by having their persons and property arrested and/or seized without probable cause.

174.   Box Elder County condoned the illegal actions of its officers and the wrongful arrest of McFarlin and Fox through its actions and words, including supporting the holding of Fox and McFarlin and allowing the interrogation to continue despite a lack of probable cause.

175.   Box Elder County's actions violated McFarlin and Fox's civil rights through its policy of allowing and not correcting such an illegal arrest.

176.   Oneida County's actions violated McFarlin and Fox's civil rights by condoning the illegal arrest and by its failure to train and/or allowing procedures that fabricate and conjure untrustworthy and unreliable evidence against persons like McFarlin and Fox in violation of their Fourth, Fifth, and Fourteenth Amendment rights.

177.   As a result of the Defendants' actions, Plaintiffs have been damaged.

178.   Pursuant to 42 U.S.C. §1988, Plaintiffs McFarlin and Fox are entitled to attorney fees and costs associated with the violation and deprivation of their civil rights, and any and all damages associated therewith.

## FIRST CAUSE OF ACTION

**(Fourth Amendment Violations Against All Defendants)**

179.   The preceding paragraphs are fully incorporated herein by this reference.

180.   The Fourth Amendment of the United States Constitution guarantees McFarlin and Fox's right to be secure in their persons and property and protects them from unreasonable searches and seizures.

181.   Defendants Berry, Walker and Zilles violated Plaintiffs' Fourth Amendment rights when they arrested McFarlin and Fox without a warrant or probable cause that either had committed a crime.

182.    Defendants Nebeker, Moore, Bowcutt, and Williams, later arrived at the scene and actively participated in continuing Plaintiffs arrest and transporting them to jail, despite the lack of probable cause.

183.    The only cognizable facts that linked Plaintiffs to the robbery were the facts that Plaintiffs appeared to be "black."

184.    Plaintiffs' reasonable explanation and alibis were sufficient to remove any reasonable suspicion the arresting officers may have held, but none of the defendants attempted to investigate Plaintiffs' story in order to corroborate their alibis.

185.    When Berry, Walker, Zilles, Nebeker, Moore, Bowcutt, and Williams arrested Plaintiffs without probable cause, they acted under the color of state law, as well as the policies and customs of the other named Defendants.

186.    Berry provided actual notice to Sheriff Potter of the facts of the arrest, including the fact that the Plaintiffs' vehicle did not match the description of the suspect's vehicle.

187.    Sheriff Potter is a final policy maker for Box Elder County.

188.    Sheriff Potter, Box Elder County, and the Utah Defendants made a decision to support and/or ratify the deprivations of liberty and property by their words, actions and complicity, including (but not limited to) allowing the interrogations to be conducted in their facility, allowing the deprivation of Plaintiffs' constitutional rights to continue despite clear evidence and alibis that Plaintiffs had not committed any crime.

189.   This decision caused Plaintiffs' constitutional rights to be violated and showed Box Elder County's deliberate indifference to the fact that Plaintiffs' rights were violated on account of their policies or customs.

190.   Oneida County borders Box Elder County.

191.   Oneida County regular works with Box Elder County to apprehend and arrest suspects who have committed crimes in Box Elder County, but have traveled into Box Elder County.

192.   Oneida County Officers have no authority to make an arrest in Utah or to extradite suspects back to Idaho without a court's order.

193.   It is Box Elder County's policy and practice to allow Oneida County officials access to Box Elder County Resources and facilities, to arrest suspects on the request of Oneida County, and to sign and submit affidavits for warrants that are produced by Oneida County Officers despite having no first hand knowledge of the veracity of the statements contained in the affidavit.

194.   In practice, Box Elder County officials rely unquestioningly on the information provided to them by Oneida County officials, no matter how improbable said information seems on its face, and follow Oneida County's requests, even if said requests are likely illegal.

195.   Box Elder County has not trained its employees, nor implemented any policy that would address situations where Oneida County asks Box Elder County to make an illegal arrest or provides false or misleading statements in an affidavit.

196.   Additionally, neither county had enacted a policy or procedure for its sheriffs and deputies to keep contemporaneous records containing important information concerning the arrest and investigation.

197.   A record should have been preserved of the chain of communication between all law enforcement involved and what was done to the Plaintiffs.

198.   Furthermore, neither Oneida County nor Box Elder County had implemented any policy or procedure that would insure an effective joint effort to investigate the Plaintiffs involvement in the Malad robbery.

199.   No initial assignments were made as to who would take charge and lead the investigation, and there were no follow-up conversations for the deputies and police officers involved to promptly and efficiently exchange, and most importantly, follow up on information that would've shown that Plaintiffs did not commit the crime.

200.   Consequently, Defendants claim to rely on a false identification from a highly suggestive photo lineup as well as the assertion that Plaintiffs' vehicle matched the dubious measurements of the suspects vehicle, supposedly taken at the scene of the crime.

201.   Additionally, no one asked the teller (or other potential witnesses from the tire store, whether or not the car matched the description or informed them that they could not see in the car because of the dark tinting or that they had personal concerns that the vehicle and other circumstances, including the fact that the vehicle didn't match the description given.

202.     Box Elder County either implemented or failed to implement a policy or training that would address the probable constitutional harm that would occur in Box Elder County when outside Agencies instruct Box Elder County employees, or use Box Elder County resources and facilities, to violate a criminal suspects constitutional rights.

203.     The failure of Box Elder County to implement an adequate policy or training for its employees who are faced with such a situation cased Plaintiffs' constitutional injuries.

204.     Because Box Elder County borders both Idaho and Nevada, and is near the state border of Wyoming, and is bisected by two major interstates; the need for such a policy to prevent constitutional violations was obvious to the point that Box Elder County's failure to implement such a policy constitutes a deliberate indifference to the risk that county employees may violate others constitutional rights.

205.     Defendants were also in contact with Oneida County Sheriff Jeff Semrad's office during the arrest.

206.     Jeff Semrad was made aware and had actual notice of the unconstitutional arrest which was not justified by probable cause.

207.     After Plaintiffs' arrest, Sheriff Semrad sent out an email to Sgt. Williams and Patsy Sherman admitting that McFarlin's Camarro did not match the description of the suspects vehicle.

208.   Knowing that there were not sufficient circumstances to create probable cause to justify Plaintiffs' arrest, Sheriff Semrad still instructed Oneida County employees to prepare charges against the Plaintiffs rather than requesting Plaintiffs release. .

209.   Jeff Semrad was an active participant during Plaintiffs interrogations in which he witnessed Williams' coercive tactics and heard Plaintiffs' plausible and verifiable alibis.

210.   Jeff Semrad is a final policy maker for Oneida County; his ratification of the other Defendants' conduct as well as his decision to allow and encourage Plaintiffs' arrest despite a lack of probable cause constitutes a policy and procedure of Oneida County.

211.   This decision/policy caused Plaintiffs' Constitutional harm.

212.   This decision/policy was made with deliberate indifference to the fact that Plaintiffs' constitutional rights were violated.

213.   Both Box Elder County and Oneida County are liable for Plaintiffs' constitutional injuries.

214.   Defendants' conduct proximately caused the violation of McFarlin and Fox's Fourth Amendment rights.

215.   Plaintiffs are entitled to attorney fees and costs for the maintenance of this action pursuant to 42 U.S.C. §1988.

216.   Finally, neither Box Elder County nor Oneida County trained their officers and employees on probable cause and reasonable suspicion.

217.    Had such a policy or training been in place at the time, Plaintiffs would have been released at the scene of their arrest, where it became apparent that they could not have been connected to the bank robbery in Malad.

218.    This lack of policy or training has caused a violation of Plaintiffs' constitutional rights.

## SECOND CAUSE OF ACTION

### (Fourth Amendment Violations Against All Defendants)

219.    The preceding paragraphs are fully incorporated herein by this reference.

220.    The Fourth Amendment of the United States Constitution guarantees McFarlin's and Fox's right to be secure in their persons and property and protects them from unreasonable searches and seizures.

221.    Defendants violated McFarlin's Fourth Amendment rights when they unlawfully seized and searched McFarlin's vehicle.

222.    After speaking with Plaintiffs at the time of arrest, Defendants had no probable cause, nor reasonable suspicion to believe that evidence from the robbery would be found in McFarlin's vehicle.

223.    McFarlin's Fourth Amendment rights were further violated when Defendants unlawfully retained possession of Plaintiffs' property after they had been released from custody.

224.    The individual Utah Defendants who effectuated, or participated in, the unlawful search and seizure of McFarlin's vehicle operated under the color of state law, as well as the policies and customs of the other named Utah Defendants.

225. Berry provided actual notice to Sheriff Potter of the facts of the arrest, including the fact that the Plaintiffs' vehicle did not match the description of the suspect's vehicle.

226. Sheriff Potter is a final policy maker for Box Elder County.

227. Sheriff Potter, Box Elder County, and the Utah Defendants made a decision to support and/or ratify the deprivations of liberty and property by their words, actions and complicity, including (but not limited to) allowing the interrogations to be conducted in their facility, allowing the deprivation of Plaintiffs' constitutional rights to continue despite clear evidence and alibis that Plaintiffs had not committed any crime.

228.  This decision caused Plaintiffs' constitutional rights to be violated and showed Box Elder County's deliberate indifference to the fact that Plaintiffs' rights were violated on account of their policies or customs.

229. Box Elder County either implemented or failed to implement a policy or training that would address the probable constitutional harm that would occur in Box Elder County when outside Agencies instruct Box Elder County employees, or use Box Elder County resources and facilities, to violate a criminal suspects constitutional rights.

230. The failure of Box Elder County to implement an adequate policy or training for its employees who are faced with such a situation cased Plaintiffs' constitutional injuries.

231.    Because Box Elder County borders both Idaho and Nevada, and is near the state border of Wyoming, and is bisected by two major interstates; the need for such a policy to prevent constitutional violations was obvious to the point that Box Elder County's failure to implement such a policy constitutes a deliberate indifference to the risk that county employees may violate others constitutional rights.

232.    Defendants were also in contact with Oneida County Sheriff Jeff Semrad's office during the arrest.

233.    Jeff Semrad was made aware and had actual notice of the unconstitutional arrest which was not justified by probable cause.

234.    After Plaintiffs' arrest, Sheriff Semrad sent out an email to Sgt. Williams and Patsy Sherman admitting that McFarlin's Camaro did not match the description of the suspects vehicle.

235.    Knowing that there were not sufficient circumstances to create probable cause to justify Plaintiffs' arrest, Sheriff Semrad still instructed Oneida County employees to prepare charges against the Plaintiffs rather than requesting Plaintiffs release.

236.    Jeff Semrad was an active participant during Plaintiffs interrogations in which he witnessed Williams' coercive tactics and heard Plaintiffs' plausible and verifiable alibis.

237.    Jeff Semrad is a final policy maker for Oneida County; his ratification of the other Defendants' conduct as well as his decision to allow and encourage Plaintiffs' arrest despite a lack of probable cause constitutes a policy and procedure of Oneida County.

238.   This decision/policy caused Plaintiffs' Constitutional harm.

239.   This decision/policy was made with deliberate indifference to the fact that Plaintiffs' constitutional rights were violated.

240.   Both Box Elder and Oneida County are liable for Plaintiffs' constitutional injuries.

241.   The Utah Defendants' conduct proximately caused the violation of McFarlin's and Fox's Fourth Amendment rights.

242.   Defendants Bowcutt, Sherman, and Semrad violated Plaintiffs' Fourth Amendment rights when they knowingly, or with reckless disregard for the truth, included, or caused to be included, false statements in Bowcutt's affidavit for search warrant.

243.   Defendants Bowcutt, Sherman, and Semrad violated Plaintiffs' Fourth Amendment rights when they knowingly, or with reckless disregard for the truth, omitted, or caused to be omitted from the affidavit for search warrant, information which, if included, would have vitiated any probable cause that may have existed.

244.   After Sheriff Semrad and Patsy Sherman had been informed by Doug Williams that he had found evidence to corroborate Plaintiffs story in the form of a bent guardrail and pieces of their vehicle on I-15; Semrad instructed Sherman to travel to Utah and provide Austin Bowcutt with the information necessary to create an affidavit of probable cause which Bowcutt would submit to the court for a search warrant for McFarlin's Camaro.

245.    In their affidavit, Bowcutt and Sherman mislead the court by including false facts or omitting important evidence that would have vitiated any probable cause that they would find evidence of the robbery in the Camaro.

246.    Bowcutt and Sherman did not inform the court that the vehicle had already been searched and that no evidence of the robbery had been found.

247.    Bowcutt and Sherman provided false and/or misleading information to the court in an effort to bolster his claim that probable cause existed.

248.    Bowcutt and Sherman failed to inform the court that Plaintiffs had provided plausible and verifiable alibis for their whereabouts during the robbery, and that these alibis had been verified when Williams found evidence of Plaintiffs' crash on I-15.

249.    Bowcutt and Sherman failed to inform the court of the unreliable manner in which the witness identified Mr. McFarlin.

250.    Bowcutt and Sherman lied to the court by stating that it was likely that evidence of the robbery would be found in Plaintiffs' vehicle.

251.    These acts and omissions caused Plaintiffs' constitutional harm.

252.    Defendants' conduct proximately caused the violation of McFarlin and Fox's Fourth Amendment rights.

253.    Plaintiffs are entitled to attorney fees and costs for the maintenance of this action pursuant to 42 U.S.C. §1988.

**THIRD CAUSE OF ACTION**

**(Fourth Amendment Violations Against Defendants, Berry, Walker, Zilles, and Box Elder County)**

254.    The preceding paragraphs are fully incorporated herein by this reference.

255.    The Fourth Amendment of the United States Constitution guarantees McFarlin's and Fox's right to be secure in their persons and property and protects them from unreasonable searches and seizures.

256.    When Defendants Berry, Walker, and Zilles ordered Plaintiffs out of McFarlin's car at gunpoint and then subsequently arrested the men, the amount of force they used under the circumstances was unreasonable.

257.    At the time of their initial contact with Officers Berry, Walker, and Zilles, there were no facts to suggest that either Plaintiff posed a threat to the officers' safety or would attempt to evade arrest.

258.    No weapon was reported in connection with the robbery.

259.    Defendants placed Mr. McFarlin into Officer Zilles' car where the heater had been turned to an excessively high and uncomfortable level.

260.    Defendants left Mr. McFarlin in Zilles' car for over an hour and ignored his requests to turn the heat down.

261.    Defendants improperly handcuffed Mr. Fox so that the cuffs were put on upside down and too tight.

262.    Defendants did not remove Plaintiffs' handcuffs until they were brought back at Box Elder County Sheriff's Office.

263. When Officers Berry, Walker, and Zilles used an unreasonable amount of force to arrest Plaintiffs, they operated under the color of state law, as well as the policies and customs of the other named Idaho Defendants.

264. All other present Defendants had actual knowledge of the excessive and unnecessary amount of force used against Plaintiffs and were complacent participants.

265. Box Elder County Employees conducted the arrest in coordination with Utah Highway Patrol and Oneida County.

266. The Arrest was conducted on behalf of Oneida County Sheriff's office.

267. Box Elder County either implemented or failed to implement a policy or training that would address the probable constitutional harm that would occur in Box Elder County when outside Agencies instruct Box Elder County employees, or use Box Elder County resources and facilities, to violate a criminal suspects constitutional rights.

268. The failure of Box Elder County to implement an adequate policy or training for its employees who are faced with such a situation cased Plaintiffs' constitutional injuries.

269. Because Box Elder County borders both Idaho and Nevada, and is near the state border of Wyoming, and is bisected by two major interstates; the need for such a policy to prevent constitutional violations was obvious to the point that Box Elder County's failure to implement such a policy constitutes a deliberate indifference to the risk that county employees may violate others constitutional rights.

270.   Box Elder County is liable for Plaintiffs' constitutional injuries.

271.   The Idaho Defendants' conduct proximately caused the violation of McFarlin and Fox's Fourth Amendment rights.

272.   Plaintiffs are entitled to attorney fees and costs for the maintenance of this action pursuant to 42 U.S.C. §1988

## **FOURTH CAUSE OF ACTION**

**(Fourteenth Amendment Violations Against all Defendants)**

273.   The preceding paragraphs are fully incorporated herein by this reference.

274.   The Fourteenth Amendment of the United States Constitution protects McFarlin and Fox from the deprivation of their life, liberty, or property without due process, and guarantees them equal protection of the law.

275.   Officers Berry, Walker, and Zilles detained and arrested McFarlin and Fox merely because they appeared to be "black," and thereby violated their Fourteenth Amendment right to equal protection of the law.

276.   Officers Berry, Walker, and Zilles acted under the color of state law, as well as the policies and customs of the other named Defendants.

277.   Officers Nebeker, Moore, Bowcutt, and Williams later showed up to participate in the unconstitutional arrest.

278.   Officers Nebeker, Moore, Bowcutt, and Williams acted under the color of state law, as well as the policies and customs of the other named defendants.

279. Berry provided actual notice to Sheriff Potter of the facts of the arrest, including the fact that the Plaintiffs' vehicle did not match the description of the suspect's vehicle.

280. Sheriff Potter is a final policy maker for Box Elder County.

281. Sheriff Potter, Box Elder County, and the Utah Defendants made a decision to support and/or ratify the deprivations of liberty and property by their words, actions and complicity, including (but not limited to) allowing the interrogations to be conducted in their facility, allowing the deprivation of Plaintiffs' constitutional rights to continue despite clear evidence and alibis that Plaintiffs had not committed any crime.

282. This decision caused Plaintiffs' constitutional rights to be violated and showed Box Elder County's deliberate indifference to the fact that Plaintiffs' rights were violated on account of their policies or customs.

283. Box Elder County either implemented or failed to implement a policy or training that would address the probable constitutional harm that would occur in Box Elder County when outside agencies instruct Box Elder County employees, or use Box Elder County resources and facilities, to violate a criminal suspects constitutional rights.

284. The failure of Box Elder County to implement an adequate policy or training for its employees who are faced with such a situation cased Plaintiffs' constitutional injuries.

285.    Because Box Elder County borders both Idaho and Nevada, and is near the state border of Wyoming, and is bisected by two major interstates; the need for such a policy to prevent constitutional violations was obvious to the point that Box Elder County's failure to implement such a policy constitutes a deliberate indifference to the risk that county employees may violate others constitutional rights.

286.    Defendants were also in contact with Oneida County Sheriff Jeff Semrad's office during the arrest.

287.    Jeff Semrad was made aware and had actual notice of the unconstitutional arrest which was not justified by probable cause.

288.    After Plaintiffs' arrest, Sheriff Semrad sent out an email to Sgt. Williams and Patsy Sherman admitting that McFarlin's Camarro did not match the description of the suspects vehicle and that other evidence supplied by his employees was not reliable.

289.    Knowing that there were not sufficient circumstances to create probable cause to justify Plaintiffs' arrest, Sheriff Semrad still instructed Oneida County employees to prepare charges against the Plaintiffs rather than requesting Plaintiffs release. .

290.    Jeff Semrad was an active participant during Plaintiffs interrogations in which he witnessed Williams' coercive tactics and heard Plaintiffs' plausible and verifiable alibis.

291.    Jeff Semrad is a final policy maker for Oneida County; his ratification of the other Defendants' conduct as well as his decision to allow and encourage Plaintiffs'

arrest despite a lack of probable cause constitutes a policy and procedure of Oneida County.

292.   This decision/policy caused Plaintiffs' Constitutional harm.

293.   This decision/policy was made with deliberate indifference to the fact that Plaintiffs' constitutional rights were violated.

294.   Both Box Elder and Oneida County are liable for Plaintiffs' constitutional injuries.

295.   Defendants' conduct proximately caused the violation of McFarlin's and Fox's Fourteenth Amendment rights.

296.   Plaintiffs are entitled to attorney fees and costs for the maintenance of this action pursuant to 42 U.S.C. §1988.

## FIFTH CAUSE OF ACTION

### (Fourth and Fourteenth Amendment Violations Against the Idaho Defendants)

297.   The preceding paragraphs are fully incorporated herein by this reference.

298.   The Fourteenth Amendment of the United States Constitution protects McFarlin and Fox from the deprivation of their life, liberty, or property without due process, and guarantees them equal protection of the law.

299.   The Fourth Amendment of the United States Constitution guarantees McFarlin's and Fox's right to be secure in their persons and property and protects them from unreasonable searches and seizures.

300.   Defendant Patsy Sherman violated McFarlin's and Fox's Fourteenth Amendment rights to due process when she presented photos of the Plaintiffs to witnesses of

the robbery, Amber Bingham and Lacey Montgomery, in a manner that was unnecessarily suggestive.

301.   The unreliable and false identification that resulted was later offered and used in an attempt to create probable cause to justify Plaintiffs' arrest and the subsequent search warrant for their vehicle.

302.   Defendant Patsy Sherman violated McFarlin's and Fox's Fourth Amendment rights by creating, disseminating, and relying upon an unreliable and untrustworthy identification of Mr. McFarlin, which she and the other defendants used to arrest Plaintiffs and deprive them of their Fourth Amendment rights, knowing that said identification was unreliable and untrustworthy.

303.   When Detective Sherman conducted the unnecessarily suggestive photo identification, she acted under the color of state law, as well as the policies and customs of the other named Idaho Defendants.

304.   Oneida County has an official policy allowing its employees to show photographs of suspects to witnesses in an attempt to obtain an identification, but does not provide guidance on how to conduct a photo lineup so as not to cause a constitutional violation.

305.   The lack of guidance on how to conduct a non-suggestive photo lineup in Oneida County's policies is the cause of Plaintiffs' constitutional injuries.

306.   The need for an adequate policy on how to properly conduct a photo lineup was so as to avoid violating criminal suspect's constitutional rights was so obvious that Oneida County's failure to implement the policy constitutes a deliberate

indifference to the risk that its deficient policy would violate someone's constitutional rights.

307. Sheriff Semrad had actual knowledge that the suggestive photo identification had occurred and that it had been used to create probable cause to justify Plaintiffs' arrest, but complicitly adopted the action by failing to rectify the harm it had caused.

308. After Plaintiffs' arrest, Sheriff Semrad sent out an email to Sgt. Williams and Patsy Sherman admitting that the photo lineup was improper.

309. Knowing that Patsy Sherman had conducted an improper and suggestive photo lineup which was used to justify Plaintiffs' arrest, Sheriff Semrad still instructed Oneida County employees to prepare charges against the Plaintiffs.

310. Sheriff Semrad's decision to ratify Patsy Sherman's decisions, and to instruct his employees to use the false identification obtained through an unnecessarily suggestive photo lineup constitutes a policy or custom of Oneida County; said policy or custom was the cause of Plaintiffs' constitutional injuries. Said policy or custom shows a deliberate indifference of Oneida County to the fact that Plaintiffs' constitutional rights were violated.

311. Oneida County is liable to Plaintiffs for the deprivation of their constitutional rights.

312. Defendants' conduct proximately caused the violation of McFarlin and Fox's Fourteenth Amendment rights.

313.    Plaintiffs are entitled to attorney fees and costs for the maintenance of this action pursuant to 42 U.S.C. §1988.

**WHEREFORE**, Plaintiffs respectfully pray for judgment against Defendants as follows:

1.    For recovery of all special and general damages sustained as a direct and proximate result of the illegal actions, violations of constitutional duties and any other wrongful acts of the Defendants, in a sum exceeding $10,000;

2.    For the recovery of all reasonable costs and attorney fees pursuant to Federal law, including, but not limited to, 42 U.S.C. §1988, and 15 U.S.C. §1681 *et seq.*;

3.    For any and all further relief this Court deems just and equitable;

4.    Plaintiffs demand a trial by jury in this matter.

DATED this 29th day of November, 2019.

MAY, RAMMELL & WELLS, CHTD.
*Attorney for Plaintiffs*


*/s/  Bron Rammell*
BRON RAMMELL

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date a copy of the foregoing *Amended Complaint and Demand for Jury Trial* was served on the following named persons at the addresses shown and in the manner indicated.

| | |
|---|---|
| Daniel L. Steel (6336)<br>Grant M. Sumsion<br>SUMSION STEELE & CRANDAL<br>545 E. University Parkway, Suite 200<br>Orem, Utah 84097<br>Telephone: (801) 426-6888<br>Email: dan@sumsionsteele.com<br>      grant@sumsionsteele.com | ☐ U.S. Mail<br>☐ Facsimile:<br>☐ Hand Delivered<br>☐ Email<br>☒ CM/ECF |
| Blake G. Hall<br>Sam L. Angell<br>Hall Angell & Associates<br>1075 S. Utah Ave., Suite 150<br>Idaho Falls, Idaho 83402<br>Telephone: (208) 522-3003<br>Email: bgh@hasattorneys.com<br>      sla@hasattorrneys.com | ☐ U.S. Mail<br>☐ Facsimile:<br>☐ Hand Delivered<br>☐ Email<br>☒ CM/ECF |
| R. Blake Hamilton<br>Ashley M. Gregson<br>Durham Jones & Pinegar<br>111 South Main Street, Suite 2400<br>Salt Lake City, UT 84111<br>bhamilton@djplaw.com<br>agregson@djplaw.com | ☐ U.S. Mail<br>☐ Facsimile:<br>☐ Hand Delivered<br>☐ Email<br>☒ CM/ECF |
| Darin B. Goff<br>Sean D. Reyes<br>Utah Attorney General<br>160 East 300 South, Sixth Floor<br>P.O. Box 140856<br>Salt Lake City, Utah 84114-0856<br>dgoff@agutah.gov | ☐ U.S. Mail<br>☐ Facsimile:<br>☐ Hand Delivered<br>☐ Email<br>☒ CM/ECF |

DATED this 29th day of November, 2019.

*/s/ Bron Rammell*
BRON RAMMELL